[No. 22699–1–I.   Division One.   February 20, 1990.]

THE STATE OF WASHINGTON, *Respondent,* v. FREDRIC
NOLTIE, *Appellant.*

*Charles K. Wiggins, John W. Hathaway,* and *Edwards & Barbieri,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Jeffrey Baird, Deputy,* for respondent.

SWANSON, J.—Fredric Noltie appeals from the judgment and sentence entered following his conviction on one count of first degree statutory rape and one count of indecent liberties.[1] Noltie contends, among other things, that the trial court erred in refusing to excuse two jurors for cause, in admitting evidence of a colposcopic examination, and in refusing to order a bill of particulars.

Appellant Noltie was charged by information with two counts of first degree statutory rape (counts 1 and 2) and one count of indecent liberties (count 3). The complaining witness was M, Noltie's stepdaughter, who was 9 at the time of trial.

Noltie married Joanne, M's mother, in February 1984; the marriage was the second for both. At trial, M testified to a series of sexual contacts with Noltie that began shortly

---

[1]Noltie's appeal from the order denying a motion for a new trial has been consolidated.

after the marriage, including at least one incident of oral intercourse and one incident of vaginal intercourse. M also related an incident, observed by her mother, in which Noltie had her touch his penis.

In addition to describing the incident of sexual touching that she observed on May 13, 1987, Joanne, M's mother, acknowledged that she and Noltie had frequently showered together with M, but that Noltie had never expressed concern about this. Joanne never saw M grab for Noltie's genitals.

Dr. Kathryn Mikesell, a pediatrician, testified that she examined M on June 11, 1987, and found a "gaping vagina without hymenal tissue." According to Dr. Mikesell, this was an abnormal condition for a girl of M's age.

Dr. Carol Jenny, a pediatrician, performed a colposcopic examination of M on November 13, 1987. During the examination, Dr. Jenny also used the colposcope to take a series of photographic slides, which she utilized to illustrate her testimony. Three of the slides were eventually admitted into evidence.

Dr. Jenny testified that M's hymenal opening was "greater than normal" and twice what she would expect. Dr. Jenny referred to two studies that correlate this size of hymenal opening to a history of sexual abuse. Dr. Jenny found some scarring in the hymenal area, but was unable to say when the scarring, which was well healed, might have occurred. Dr. Jenny found no evidence of scarring from the hymen outward and stated that it would be virtually impossible for a "straddle injury" to lacerate the hymen without also affecting the external structures.

Fredric Noltie took the stand and denied M's allegations. He stated that shortly after his marriage, Joanne began to experience rapid and severe "mood changes," during which she would become a "demon," falling into a rage, using foul language, and physically abusing M. Noltie testified that Joanne, in the presence of others, would frequently approach him, unzip his pants, and begin to fondle him or perform oral sex, an allegation that Joanne had denied.

Noltie was troubled by the fact that M would frequently grab at his genitals and that Joanne insisted the three shower together. Noltie stated that he expressed his concerns regarding these activities to Joanne's family and to friends.

Noltie gave a different account of some of the incidents described by M, including the incident of sexual touching. According to Noltie, M had grabbed his genitals while he was tucking her into bed.

Noltie's son from his first marriage testified that he had frequently observed Joanne reach for and fondle his father's "sexual areas" with no regard for his or M's presence. Other witnesses testified that Noltie had expressed to them his concerns regarding the family showering together and M's grabbing of his genitals.

Dr. David Miller, a gynecologist from the University of California, testified on behalf of the defense. Dr. Miller reviewed the colposcopic evidence and concluded that he could see "no evidence of penile penetration." Dr. Miller challenged the accuracy of Dr. Jenny's measurements and noted that to preserve a photographic record of a colposcopic examination, it is necessary to distort, to some extent, the sexual organs.

The jury returned a verdict finding Noltie guilty of one count of first degree statutory rape and of indecent liberties (counts 1 and 3). Count 2 was dismissed by the court, a decision that has not been appealed.

Noltie first contends that the trial court erred in refusing to excuse jurors Evelyn Sun and Sondra Rhodes for cause. Noltie maintains that both demonstrated actual bias during voir dire testimony.

Granting or denying a challenge for cause lies within the discretion of the trial court, and an appellate court will not reverse absent a manifest abuse of discretion. *State v. Gilcrist,* 91 Wn.2d 603, 611, 590 P.2d 809 (1979); *Cheney v. Grunewald,* 55 Wn. App. 807, 810, 780 P.2d 1332 (1989); *State v. Bernson,* 40 Wn. App. 729, 740, 700 P.2d 758, *review denied,* 104 Wn.2d 1016 (1985). Noltie suggests that

this court has an obligation to review independently the trial court's decision with "heightened scrutiny." The cases cited for this proposition, however, reinforce the abuse of discretion standard. *See, e.g., Miles v. F.E.R.M. Enters., Inc.,* 29 Wn. App. 61, 65, 627 P.2d 564 (1981). Moreover, a reviewing court must, of necessity, defer to the trial court's decision on a challenge for cause. As this court has quoted with approval:

> A determination by the trial judge of the qualifications of a venireman necessarily involves a judgment based on an observation of the demeanor of the venireman and, in the light of that observation, an evaluation and interpretation of his answers as they relate to whether he would be fair and impartial if chosen as a juror.

*State v. Gosser,* 33 Wn. App. 428, 434, 656 P.2d 514 (1982) (quoting *State v. Cuckovich,* 485 S.W.2d 16, 23 (Mo. 1972)); *see also State v. Rupe,* 108 Wn.2d 734, 749, 743 P.2d 210 (1987), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 934, 108 S. Ct. 2834, *reh'g denied,* 487 U.S. 1263, 101 L. Ed. 2d 976, 109 S. Ct. 25 (1988).

A prospective juror must be excused for cause if the trial court concludes that he or she is actually biased. *State v. Gosser, supra* at 433. Actual bias is statutorily defined as:

> the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging . . ..

RCW 4.44.170(2).

In extensive voir dire testimony, juror Evelyn Sun stated that in the previous year she had been the victim of domestic violence and was in the process of obtaining a divorce. Sun also was "on the board for King County for the prevention of child abuse and neglect," an organization that "basically works on education and prevention." Sun explained that her work on the board did not involve any contact with those who investigate child sexual abuse or programs that assist the victims of child abuse. Actual bias is not presumed simply from a potential juror's association

with a particular organization. *See Cheney v. Grunewald, supra.*

Moreover, while Sun conceded that she had initially indicated that she thought she could not be fair, she explained that this was no longer the case. When asked by defense counsel whether, in light of her background and experience, she might not have a predisposition toward one side in the case or give more credence to a child witness, Sun stated that she would listen to the evidence and make her decision based on the evidence. We find no abuse of discretion in the trial court's denial of Noltie's challenge for cause.

■ In addition, appellant exercised a peremptory challenge to excuse Sun. The use of a peremptory challenge to excuse Sun "'cures' the error unless defendant can show the use of the peremptory challenge actually prejudiced his case." *State v. Bernson, supra* at 741; *State v. Rupe, supra; State v. Latham,* 100 Wn.2d 59, 667 P.2d 56 (1983). Here, Noltie has failed to identify any actual prejudice resulting from the use of the peremptory challenge on juror Sun. *Cf. State v. Latham, supra* (declining to address contention that defendant was prejudiced because use of peremptory challenges denied him opportunity to exclude other jurors with strong opinions about drug use).

Noltie maintains that he was prejudiced because he subsequently exhausted all peremptory challenges, relying on the following statement:

> A refusal to sustain challenges for proper cause, necessitating peremptory challenges on the part of the accused, will be considered on appeal as prejudicial where the accused has been compelled subsequently to exhaust all his peremptory challenges before the final selection of the jury.

*State v. Parnell,* 77 Wn.2d 503, 508, 463 P.2d 134 (1969) (quoting *State v. Stentz,* 30 Wash. 134, 70 P. 241 (1902)). In *State v. Gilcrist, supra,* however, our Supreme Court declined to apply *Parnell* to a situation in which the trial court had denied three of appellants' challenges for cause and appellants exhausted their peremptory challenges

before they could remove the third challenged juror. *Gilcrist,* at 610. In distinguishing *Parnell,* the *Gilcrist* court noted the unusual facts in that case, where the juror had sat through the defendant's preliminary hearing. In addition, the juror in *Parnell* had essentially dared defense counsel to exercise the peremptory challenge, and the trial court refused a request by counsel for an additional peremptory challenge to replace the one used on the challenged juror. The circumstances here do not remotely resemble those in *Parnell.*

The voir dire testimony of Sondra Rhodes, who eventually sat on the jury, presents a closer question. In extensive testimony, Rhodes repeatedly stated that she "might" have difficulty being fair because she had two granddaughters, but that she "hoped" that she could be fair and would "try" to be fair. At first, Rhodes felt that she might lean in favor of child witnesses, but then stated, "the more I've listened to the Court and the more I participated in it, it seems like it would be a lot easier to be fair, but at first I was very apprehensive about it." When asked whether she expected that the defendant would have to present evidence in order to support his innocence, Rhodes replied, "No." Finally, in response to questions from the trial court, Rhodes acknowledged that she was expressing a "doubt" that she would be fair, not indicating that she would not be fair. Rhodes then indicated that her doubts were based in part on the fact that she had not been a juror before.

As appellant notes, Rhodes never positively stated that she would be fair. Rather, her responses were always couched in terms of "hoping" and "trying." Appellant maintains that Rhodes' voir dire testimony demonstrates that she had prejudged Noltie's guilt. However, the issue is not whether Rhodes had preconceived ideas, but whether she was able to put those ideas aside and decide the case on the basis of the evidence presented. *State v. Gosser, supra* at 433. A review of Rhodes' testimony indicates that she was simply being conscientious and candid in her responses. Her refusal to state categorically that she would be fair

appears to arise primarily from the fact that she had never been a juror before. Moreover, given the extensive voir dire testimony, the trial court was in the best position to judge whether Rhodes' answers merely reflected honest caution based on her lack of prior jury experience or manifested some likelihood of actual bias. We cannot say, based on the testimony, that the trial court abused its discretion in not excusing Rhodes for cause.

Rhodes' testimony differs substantially from that in *State v. Moser,* 37 Wn.2d 911, 226 P.2d 867 (1951), upon which appellant relies. In *Moser,* although the potential juror testified that he "did not know" whether he would be affected by his membership in a certain organization or whether he could be fair, he also stated that he thought he would be prejudiced and that he could not be fair. *Moser,* at 917. No similar testimony occurred in the instant case. *Cf. Cheney v. Grunewald, supra* (juror's association with M.A.D.D. and personal experience of niece's death from intoxicated driver, coupled with statement that he would not receive fair trial from six jurors with his frame of mind, demonstrated actual bias).

Noltie next challenges the admission of three photographic slides, taken through a colposcope, showing enlarged views of M's sexual organs, and expert testimony based upon the slides. The slides were taken during an examination performed by Dr. Carol Jenny, one of the State's expert witnesses. The challenged evidence was first admitted during the testimony of Dr. David Miller, the defense's expert witness, who testified before the State's expert witness because of a scheduling problem. To illustrate Dr. Miller's testimony, the defense prepared photographs made from the colposcopic slides. Dr. Miller reviewed the photographs in great detail in front of the jury in order to support his opinion that they showed no evidence of sexual abuse. The State's expert, Dr. Carol Jenny, subsequently projected the slides to illustrate her opinion that M's hymenal opening was unusually large and that the

scarring present was not of the type to be expected from a "straddle" injury.

In Washington, expert testimony based on "new scientific theories" is admissible only if it satisfies the standards set forth in *Frye v. United States,* 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923). *See State v. Black,* 109 Wn.2d 336, 342, 745 P.2d 12 (1987); *State v. Madison,* 53 Wn. App. 754, 770 P.2d 662, *review denied,* 113 Wn.2d 1002 (1989); *see generally* 5A K. Tegland, Wash. Prac., *Evidence* § 296 (3d ed. 1989). Under the *Frye* standard, "the scientific principle from which deductions are made must be sufficiently established to have gained general acceptance in the scientific community." *State v. Black, supra.* Noltie first maintains that the State failed to establish that colposcopic evidence meets the *Frye* standard.

■ We find no basis for Noltie's contention that colposcopy constitutes a "novel" field or scientific technique, even though its use in child abuse cases may be relatively recent. Dr. Richard Joslin, a defense witness, acknowledged the correctness of defense counsel's characterization of a colposcopic examination as "[e]ssentially [a] magnification [that makes] it easier to see defects that may exist that might be more difficult to see with the naked eye . . .". Dr. Jenny described the colposcope as "a microscope that was developed to diagnos[e] cancer. It magnifies images twenty times the normal size. It makes very realistic reproduction of what the clinician sees at the time." Dr. Miller's description of the colposcope was similar:

A [colposcope] literally translated means a scope for examining the neck, culdos. *It is an instrument which we use in obstetrics and gynecology.* It has approximately between fifteen and thirty times magnification. It is a binocular instrument, which gives one an in–depth view.

(Italics ours.)

In sum, the experts were in agreement that a colposcope is "little more than a magnifying glass with a fancy name". *Onwan v. Commonwealth,* 728 S.W.2d 536, 537 (Ky. Ct. App. 1987). The instrument is in general use in the medical

community and is no more a "novel" device or scientific process subject to the *Frye* standard than binoculars or a weak microscope. Courts in other jurisdictions have also rejected the contention the colposcopic evidence is subject to the *Frye* standard. *See People v. Luna,* 204 Cal. App. 3d 726, 250 Cal. Rptr. 878 (1988); *People v. Mendibles,* 199 Cal. App. 3d 1277, 245 Cal. Rptr. 553 (1988); *Onwan v. Commonwealth, supra.*

■ Noltie also argues that the "gruesome" colposcopic slides should have been excluded pursuant to ER 403 because any minimal probative value was substantially out-weighed by the danger of unfair prejudice. This argument was essentially rebutted by the testimony of his own expert. Dr. Miller reviewed the photographs made from the slides in great detail in front of the jury to support his view that they were exculpatory, revealing no evidence of sexual abuse. The trial court did not abuse its discretion in admitting the evidence. *See State v. Kendrick,* 47 Wn. App. 620, 736 P.2d 1079, *review denied,* 108 Wn.2d 1024 (1987).

Noltie next contends that the trial court should have granted his motion for a bill of particulars. Noltie claims that the information was too vague to permit him to pre-pare an adequate defense and to separate the charged acts from the "hundreds of innocent contacts" he had with M during the charging period. The State opposed the motion, arguing that a defense interview with M was imminent. The record reveals only that the trial court deferred a ruling on the motion on September 30, 1987; there is no indication that the motion was ever denied.

■ "A technically proper information may be subject to a timely motion for a more definite statement if it is vague as to the specifics of the crime committed." *State v. Dictado,* 102 Wn.2d 277, 286, 687 P.2d 172 (1984). A bill of particulars is provided a defendant in a criminal case to assist in the preparation of a proper defense. *State v. Brown,* 45 Wn. App. 571, 578, 726 P.2d 60 (1986). The trial court's ruling on the request for a bill of particulars will not

be disturbed on appeal absent an abuse of discretion. *State v. Dictado, supra.*

The trial court's ruling on Noltie's motion for a bill of particulars occurred on September 30, 1987; trial did not begin until April 1988. A defense interview with the complaining witness had already been scheduled. Under these circumstances, the trial court's decision deferring the motion for a bill of particulars was not an abuse of discretion. Moreover, there is no contention that the defense was not fully informed of the details of M's testimony prior to trial. Noltie never renewed the motion for a bill of particulars; nor has he identified any information that the State might have furnished, *i.e.,* information that surprised him at trial, that would have provided additional notice of the charges. *See State v. Dictado, supra* at 286. Consequently, even if we assume that the trial court eventually denied the motion, no abuse of discretion occurred.

Noltie next contends that the trial court erred in refusing to dismiss one of the two statutory rape counts as "duplicitous." Noltie maintains that "the State offered the *same* evidence in support of both statutory rape charges," a potential double jeopardy concern. (Italics ours.)

The State did not, however, present the "same evidence" to support the two counts of statutory rape. Rather, M testified to at least one incident of oral intercourse and one incident of vaginal intercourse. This evidence was sufficient to support the two counts.

Despite Noltie's attempts to characterize the issue as one involving double jeopardy, his underlying concern appears to involve jury unanimity. Generally,

> a defendant may be convicted only when a unanimous jury concludes that the criminal act charged in the information has been committed. When the prosecution presents evidence of several acts that could form the basis of one count charged, either the State must tell the jury which act to rely on in its deliberations or the court must instruct the jury to agree on a specific criminal act.

(Citation omitted.) *State v. Kitchen,* 110 Wn.2d 403, 409, 756 P.2d 105 (1988); *see also State v. Petrich,* 101 Wn.2d

566, 683 P.2d 173 (1984). The trial court in the instant case gave a unanimity instruction. Consequently, the State was not required to elect the specific acts upon which it sought conviction. Because the jury was instructed that it had to "unanimously agree that at least one separate act of sexual intercourse pertaining to each count has been proved beyond a reasonable doubt," there can be no inference that the verdict convicting Noltie of only one count of statutory rape was somehow a "compromise" verdict. The fact that the specific act relied upon by the jury to convict Noltie cannot now be identified does not, under these circumstances, raise an appealable issue. Noltie has cited no authority for his contention that he has "the right to know what criminal act supports his conviction and what acts do not."

Noltie's final contention is that the cumulative effect of erroneous rulings deprived him of a fair trial. Because we have determined that the rulings challenged on appeal were not erroneous, we need not address this contention.

Judgment affirmed.

FORREST, J., and REVELLE, J. Pro Tem., concur.

Review granted at 114 Wn.2d 1019 (1990).