**Aaron LITAKER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–88–00541–CR.**

Court of Appeals of Texas, San Antonio.

Feb. 21, 1990.

Rehearing Denied March 7, 1990.

Victor Roberto Garcia, Del Rio, for appellant.

Thomas F. Lee, Dist. Atty., for appellee.

Before BUTTS, CHAPA and BIERY, JJ.

OPINION

CHAPA, Justice.

The motion for rehearing is granted, the majority opinion dated January 10, 1990 is withdrawn and the following opinion is substituted in its place.

This is an appeal from a conviction for the offense of murder. A jury found appellant guilty and assessed punishment at 99 years' imprisonment.

Advancing four points of error, appellant first contends that it was error for the trial court not to grant his motion to suppress the [evidence obtained as a result of the] search warrant if the search warrant was issued without probable cause and if the search warrant failed to comply with the requirements of TEX.CODE CRIM.PROC. ANN. art. 18.01(a), (b), (c) (Vernon Supp. 1989). The second and third points of error challenge the sufficiency of the evidence to support the conviction. The last point of error is that appellant's motion for mistrial, following the prosecutor's statement during the jury argument at the punishment phase, should have been granted.

Appellant's written motion to suppress alleged specifically that appellant:

would show that the affidavit for search and search warrant are legally insufficient and the allegations therein are invalid in that the same do not contain sufficient underlying facts adequately to inform the magistrate of how the alleged affiant obtained his information and does not contain sufficient underlying facts to establish the credibility and reliability of the alleged affiant.

Although the written motion did not refer specifically to article 18.01, *supra*, requirements, the trial court did not restrict appellant to the written grounds, and the subject was touched on during the hearing. In addition, testimony was permitted regarding probable cause.

Article 18.01 provides, in pertinent part:

\* \* \* \* \* \*

(b) No search warrant shall issue for any purpose in this state unless sufficient facts are first presented to satis-

fy the issuing magistrate that probable cause does in fact exist for its issuance . . .

(c) A search warrant may not be issued pursuant to Subdivision (10) of Article 18.02 of the code unless the sworn affidavit required by Subdivision (b) of this article sets forth sufficient facts to establish probable cause: (1) that a specific offense has been committed, (2) that the specifically described property or items that are to be searched for or seized constitute evidence of that offense, (3) that the property or items constituting evidence to be searched for or seized are located at or on the particular person, place, or thing to be searched . . .

\* \* \* \* \* \*

Article 18.02 provides, in pertinent part: A search warrant may be issued to search for and seize:

\* \* \* \* \* \*

(10) property or items, except the personal writings by the accused, constituting evidence of an offense or constituting evidence tending to show that a particular person committed an offense; . . .

The record shows that on October 7, 1987, shortly after 3:00 a.m. a fire in apartment 23 of the La Plaza Apartments in Del Rio was reported. Barry Mulford, a fireman with the Del Rio Fire Department, testified that he discovered the deceased, Sandra Juarez Andrus, on a bed. She was nude and appeared dead. Mulford checked to see if there was a pulse and found none. The body was removed and the fire extinguished.

Detective Luis Robles testified he located hair stuck under the deceased's fingernails. The area around her eyes was swollen and there were bruises on her body. Robles recovered a vase with blood on it from the living room and he removed bloodstained sheets and a comforter from the bed.

Gary Coursey lived in apartment 19 in the same complex. He arrived home from work around midnight and was watching TV about 1:30 a.m. on October 7, 1987. He took his dog outside. A man was walking toward him and tried to hide his face from Coursey. However, Coursey recognized him as the same man he saw there one week before. He described the man: ". . . reddish-orange hair, military-type haircut, about five feet, eleven inches." Coursey returned to his apartment and went to bed. The fire awakened him.

Ocie Burse, Jr., who resided in apartment 22, testified that he arrived home about 10:00 p.m. on October 6th. He and another person worked on an auto transmission. The other one, the 19 year old son of the manager, left and Burse worked until about 2:45 a.m. Then, as he walked to his apartment, he heard the sound of boots coming down the wooden stairs. The man coming down the stairs bumped into Burse as he left the stairs. The man did not speak. Burse described the man as wearing a blue jean jacket, blue jeans, and a baseball cap. The man had red hair. Burse had just gone to his car, which he had parked behind apartment 23. He saw that the car of the deceased had been parked there after he left his car, after 2:45 a.m. He said the car was not there before. Burse said he had seen a person who resembled appellant at the apartment complex about two weeks before.

Burse said he saw the deceased on Monday evening, October 5th. Another person, Joaquin Saenz, testified he also spoke to her on the telephone that same evening. Emily Wright, a friend of the deceased, testified she saw the deceased Tuesday afternoon in a car on the bridge from Mexico. It looked like the deceased's mother driving the car.

Investigation by the police led them to the Back Door Lounge. Employees there told the officers that the deceased was last seen by them in the early morning hours of October 5th in the company of appellant. The description given by Burse matched the physical description of appellant. Detectives interviewed appellant at police headquarters on October 8th.

Following the interview, Donald Weaver, the evidence officer assigned to investigate the case, secured the issuance of a search

warrant based upon his affidavit on October 9, 1987. The affidavit set out the reasons why appellant was a suspect: he was seen with the deceased at the lounge, and the description by Burse of the man leaving the scene on the 7th matched appellant's description. The affidavit set out certain items of evidence recovered at the scene, the results of the autopsy performed on the deceased indicating murder, and Weaver's subsequent confirmation by a dental diagnostic expert that the person who bit the deceased on the breast and pubic area could be identified through a diagnostic cast with impressions of the person's teeth, intro-oral photos of the person's mouth, face, and teeth, and a wax bit impression of the teeth. The affidavit further alleged that appellant showed signs of injury to his face, to his lips and to his right hand at the time he was interviewed. At that same time, the affidavit alleged, appellant wore shoes with sole impressions similar to those found at the scene. In addition, appellant smoked Doral filter-tip cigarettes like a partially smoked one found at the scene.

The affiant stated that he believed the dental impressions of appellant would match the bite marks on the body; that blood and saliva samples would establish appellant had the same blood type as blood found on the body; that samples of appellant's hair would match those recovered from the body, that fingernail clippings would show the fingernail markings on the deceased's face were caused by appellant's fingernails; that photographs of appellant's face, hands, and body would show injuries consistent with defensive injuries caused by the deceased; that hand x-rays would disclose injuries consistent with injuries received while striking the deceased; that latent fingerprints and palm prints would be appellant's; that a search of appellant's residence, automobiles, and trash would uncover the footwear matching the sole impressions found, along with a fuel container and a four-pointed instrument used to injure the deceased. The affiant also stated that the denim clothing and baseball cap should be included in the search for bloodstained clothing. Further,

he stated the drainage traps in appellant's house might contain blood or hair. The affidavit then requested that a warrant to search be issued covering all the matters, including the medical, dental and forensic searches.

■ An examination of the search warrant affidavit reveals that the requirements of the search warrant statutes have been met. It is not necessary to state in every affidavit that the defendant was actually at the scene of the crime. Moreover, the affidavit set out sufficient bases to warrant a search of the premises for certain items. *See Mulder v. State,* 707 S.W.2d 908, 915–16 (Tex.Crim.App.1986); article 18.01, *supra.* The State also notes correctly that some of appellant's arguments on appeal were not presented at trial. The point of error on appeal must comport with the objection at trial. *See Hackbarth v. State,* 617 S.W.2d 944 (Tex.Crim.App.1981). However, even if these same arguments had been presented at trial, the motion to suppress would properly have been denied. The point of error is overruled.

Points two and three challenge the sufficiency of the evidence. In addition to the testimony already noted, several experts were witnesses. Robert Whritenour, a retired United States Army latent print examiner, stated that broken glass from the vase disclosed a bloody fingerprint of appellant. The expert employed "photography and a computer image enhancing a latent print on it." He testified the position of the fingerprint showed the vase was held upside down. He matched the latent fingerprint with the known print of appellant and stated that the same person, appellant, made the latent print. The latent fingerprint was bloody, as determined by an "amido black blood enhancement process." The two prints were shown to have 15 matching ridge characteristics. The expert stated that these 15 were the most obvious but that there were also less obvious matching ridges.

Belinda Mier, a forensic serologist, testified that blood on the vase showed positive blood type B, which was the deceased's blood type. She also found human blood

type B in the band of appellant's watch. She identified human blood on the inside of appellant's right boot. She also found traces of blood (B antigen) in a red velvet jewelry box from appellant's house. There were type B blood antigens on tissues found in the yard of the apartment complex on the 7th of October. The serologist testified that the deceased was blood group (or type) B, and that only 11% of the Hispanic population has that type blood. She said that the deceased had two subcategories of the B group. Appellant tested for blood group O. Type B antigen was found in the kitchen sink of the deceased's apartment and on a broken gold chain.

Juan Rojas from the Texas Department of Public Safety testified regarding hair comparison. Unknown hairs had been recovered from the right and left forearm of the deceased, from a balloon, and from the broken vase. These hairs were found to be consistent with the characteristics of appellant's hair. The hairs recovered from the comforter and the sheets showed consistent characteristics to the appellant's head and pubic hair. There were no inconsistencies shown which would exclude appellant, who, it was shown, had red hair.

Dr. Robert Bux, medical examiner for Bexar County, performed the autopsy which disclosed bite marks on the deceased's breast and pubic area as well as numerous blows to the head and face. Her eye was punctured with an instrument like a fork. Bruises on her left arm indicated a struggle with another. Abrasions on the neck indicated strangulation, which contributed to her death. An additional contributing cause of death was cranial cerebral injuries. There was no carbon monoxide in her blood, which indicated that she died before the fire occurred.

Dr. William Fritsch, a Del Rio dentist, had made impressions of the teeth of appellant, and those were in evidence. Dr. John McDowell, a forensic dentist (a board certified forensic odontologist), testified that identification of individuals through their teeth is well recognized in forensic science. He said that forensic examination of bite marks on victims was used to include suspects and to exclude suspects as the person that may have inflicted the wound. He affirmed that if there were just one inconsistency in the bite mark pattern, that would exclude the individual as being the biter. At the time of the autopsy of the deceased, Dr. McDowell was called into the case by the medical examiner. He identified the elliptical injuries as human bite marks on the breast and on the pubic area.

After explaining in detail the process of his comparison of the bite mark photography and the impressions of appellant's teeth, the doctor stated that the bite mark on the breast was inconclusive as to identification, although it was a human bite. However, the examination of the bite mark on the pubic area did include appellant as the biter. Although the expert could not state positively that appellant inflicted the bite mark, he was not excluded because there were three inconsistencies. The distance from canine to canine (teeth of appellant) was identical and the canine teeth fell right into the marking areas. The second consistency with appellant's teeth was the sharpness of one tooth mark causing a puncture wound, with the other being much flatter. This pattern matched appellant's teeth exactly. The third consistency between the bite mark and appellant's teeth was the matching general overall outline and the arch. He agreed that a single inconsistency between the teeth pattern of appellant and the bite mark would exclude appellant. He stated he was not able to find one inconsistency. He could not rule out appellant as the person who inflicted the bite.

Other evidence showed that a fire had been set in the bedroom where the deceased was found. A glass jar (like a mayonnaise jar) containing gasoline and a charred bit of toweling was recovered. Officers retrieved strips of white toweling from appellant's workshop which had a pattern matching the charred toweling. Further, the toweling from the scene had "reddish material" (like car wax) on it as did the toweling from appellant's house.

Emily Wright, a friend of the deceased, testified she and other "regulars" at a bar

frequented by them expected the deceased to join them on Tuesday night but she failed to appear. They telephoned her apartment several times between 9:00 p.m. and 11:00 p.m. and got no answer. The evidence showed that part of the telephone was missing from the crime scene. It was never found.

The witness testified that she talked with appellant several days after the death. The appellant told her that he had seen the deceased at the Back Door Lounge several nights before the death. The appellant told her that he went home with the deceased to her apartment and that they had been drinking.

The same witness testified that the deceased dated others, among them Leonard White, who had dark hair and was balding, and Ronald Ewalt. She said that the deceased had requested assistance twice regarding a person named Brian Bonnet, who, she said, was a "pest." Also she said Brian had become angry with the witness when she asked him to get out of her car. She said he had a temper. Brian had long blond hair.

Marshall Stidham testified that he and his wife lived at La Plaza Apartments in number 21. They arrived home about 12:30 a.m. on Tuesday the 6th of October. He saw Burse and the Rust boy working on a car. After the couple went to bed, the witness heard "thumping noises" like a "wooden thud." It was agreed that the noise could be caused by someone on the wooden stairs. Then, "right before they started yelling fire," he heard glass shattering. He agreed the glass breaking could have been the windows in apartment 23 where the fire was.

The defense presented witnesses, among them a man and wife who were neighbors of appellant. The wife testified that she looked out the window about 4:30 a.m. on Monday the 5th and saw appellant coming down the street in his pickup. Appellant's mother testified that the wife of appellant telephoned her in another state on the morning of the 5th and was upset. The wife told her that appellant had just come home, had been drinking, and he told her

he had been in a fight. He gave no particulars and went to bed.

Appellant testified that he and the deceased were together and he followed the deceased to her apartment in the early morning hours of October 5th (Monday), after the Back Door Lounge closed. They were drinking, he said, and they had sexual intercourse. As appellant was putting on his clothes in the living room, and as the deceased was also getting dressed in the living room, the door burst open and a man came into the room. Appellant said the man was wearing a motorcycle helmet, blue jeans and jacket.

Appellant testified, "He went straight for Sandra and hit her." Appellant said he tried to help. The man shoved him to the floor. Appellant said he grabbed the vase and tried to hit the man in the face shield. "He had a full face mask," and it "busted over his helmet." Sandra was bleeding from the nose or mouth. Then another "guy" came through the door and grabbed the appellant from behind, put him on the floor, and held what appellant believed to be a gun to his head. The other man and Sandra were scuffling in the bedroom. In a few minutes that man came out and the other one cautioned appellant not to move. The two left.

At that time appellant said he grabbed his shoes and "exited the door." He said he did not "at that moment" try to find out if Sandra was okay. "I didn't feel that she was really harmed that bad." Appellant went home. He said he told his wife he had been in a fight, and he said he had blood on his hands and shirt.

Appellant testified that he coached a soccer team of six and seven years old. He said that before the homicide a metal goal post bar had fallen on his back. He said that as an aircraft mechanic in the Air Force, he would cut his hands and "bust" his knuckles. The State had earlier introduced photographs of appellant which reflected injuries. Detective Robles testified that there was a bruise (and swelling) on one hand and a cut on the knuckle. One hand reflected burns; appellant explained to the officer how he burned his hand.

Further, there was a scratch mark on his shoulder. The photographs were taken within three days of the discovery of the crime. Appellant said you could bump your head on the stabilizers and cut yourself on any of the flight controls. This was his explanation of injuries the officers noted on him immediately after the commission of the offense, which prompted the taking of photographs.

Appellant denied he went back to the deceased's apartment after leaving on Monday morning. He also said he was at work and not at the apartment complex during the other times the others said they saw him there. He said he had soccer practice for an hour on Tuesday evening, the sixth, going home after 7:00 or 7:30 p.m. He said he did not leave his house until the following morning when he went to work, except to the store to get some Alka–Seltzer. Then he went home to sleep.

On cross-examination, appellant admitted he had known the deceased four to five months. He admitted he did not go to the police to report the bizarre incident of the two men at the apartment. "[T]hey hadn't beaten me, and I figured if she wanted the law called she could have called them on her own." He said he did not know how a pubic hair of his had gotten on the balloon found in the living room. He confirmed that he had told the police that he burned his hand at a barbecue.

■ In reviewing a sufficiency of the evidence claim, the appellate court is bound to follow the same standard of review for both direct and circumstantial evidence. *Wilson v. State,* 654 S.W.2d 465, 472 (Tex. Crim.App.1983) (opinion on rehearing). *See McGoldrick v. State,* 682 S.W.2d 573 (Tex. Crim.App.1985). The standard in judging the sufficiency of the evidence is whether on viewing the evidence in the light most favorable to the verdict, any rational trier of fact would have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 317–18, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979). Conversely, the mirror reflection of the *Jackson* rule is that a conviction cannot be sustained if the circumstances do

not exclude every other reasonable hypothesis except that of the guilt of the defendant. *Gentry v. State,* 770 S.W.2d 780, 796 (Tex.Crim.App.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 2458, 104 L.Ed.2d 1013 (1989) (citations omitted). It is not required that the circumstances should, to a moral certainty, exclude every hypothesis, but that the hypothesis is reasonable, consistent with the facts proved and the circumstances surrounding the offense. *Id.,* citing *Carlsen v. State,* 654 S.W.2d 444, 447 (Tex.Crim.App.1983).

The jury, being the judge of the facts and credibility of the witnesses, could choose to believe or disbelieve the witnesses, or any portion of their testimony. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex. Crim.App.1986), *cert. denied,* — U.S. ——, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988).

■ The jury could have rejected appellant's story of the helmeted intruder and his accomplice in the early hours of Monday morning. It could have disbelieved his statement that he did not go to the apartment again. Although appellant said he broke the vase over the helmet, he did not explain how his bloody fingerprint got on the vase. He said he did not receive a beating from the two intruders, and he said he had blood on his clothing and hands although he immediately went home. He said he told his wife he had been in a fight. The jury could consider that it was type B blood on his fingerprint found on the vase and that the same type B blood was found inside his watch band. There was also expert opinion testimony that "the fingerprint was placed on the vase while the finger was bloody." The expert negated the question on cross-examination, "Could the fingerprint have been on the vase and then the blood have been put on …?". Further, the jury could examine the evidence of the hairs, wholly consistent with those from appellant's head and body, found on the deceased and on· the bloodstained bed linens. The jury could also consider the bite mark on the deceased's body, which matched the impressions of appellant's teeth in three specific and consistent ways so as not to exclude

him as the biter. The jury also had before it evidence from two witnesses who described the red-headed man at the scene shortly before the fire. In addition, it could consider the charred toweling in the jar used to set the fire and the toweling of matching pattern belonging to appellant. The jury chose to disbelieve appellant's version of how he might have received the injuries to his back, face, and hands.

■ Every circumstantial evidence case must necessarily be tested by its own facts to determine the sufficiency of the evidence to support the conviction, and, as noted, it must be viewed in the light most favorable to the State. *Russell v. State*, 665 S.W.2d 771, 775 (Tex.Crim.App.1983), *cert. denied*, 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984) (citations omitted). In circumstantial evidence cases it is not necessary, however, that every fact point directly and independently to the defendant's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Id.* In the present case, after viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Points of error two and three are overruled.

■ In his fourth point of error, appellant contends that the trial court committed reversible error by denying a mistrial, following the prosecutor's comments about appellant's failure to testify in the punishment phase. We agree.

The statement by the prosecutor at the punishment phase was:

Ladies and gentlemen, there are more people involved in this case than just Aaron Litaker. Is the act of deterrence an important consideration to determining what should be done in this case? Certainly that is an importance, too. You know, I think that it would be a very critical thing *if I would hear a defendant get on this witness stand and say yes, I did it and I really am sorry about that and I'm trying to do something to get that straightened out. I'm seeing a doctor or I'm doing this and I know that that—what was done was terrible, and I'm going to do something to get it straight. Well, you don't hear that in this case. That didn't happen.* (Emphasis added)

Defense counsel objected, pointing out that the court's charge contained "very clear instructions not to refer to this defendant's failure to testify." The trial court sustained the objection and instructed the jury to disregard the statement of counsel. Defense counsel moved for a mistrial and was overruled. The trial court then again instructed the jury:

Again, members of the jury, you are referred to paragraph number eight in the court's charge, and you will not in any way allude to or refer to the fact that the defendant did not testify during the punishment phase of the case during the course of the deliberations. You are so instructed. The motion is overruled.

The Texas Court of Criminal Appeals condemned such remarks of the prosecution in *Owen v. State*, 656 S.W.2d 458 (Tex. Crim.App.1983) (en banc). Because of the extraordinary similarity to the case at bar, *Owen* is controlling. In *Owen*, the Court reversed a voluntary manslaughter conviction because of the following argument by the prosecutor:

"He [deceased] was a living breathing human being that is not here today to tell us how he feels about what happened because of Lewis Owen [appellant]. Now, in the Defendant's testimony you heard the Defense rest, they did not present any testimony to you, but in the testimony you heard this morning, I submit to you and by your verdict, you have said that he lied to you. He lied to you about that self-defense theory. He had the opportunity to come up and *say to you that he was sorry.* I submit to you–"

\* \* \* \* \* \*

"They had the opportunity to present any evidence to you that they wished. I would submit to you that the first step in rehabilitating somebody, the first step in

granting somebody probation is for him to at least *say that he is sorry for what happened.*" (emphasis added)

*Owen v. State*, 656 S.W.2d at 459.

Owen's objections were sustained and instructions given, but the motion for mistrial was denied. In reversing the trial judge for failing to grant the mistrial, the court stated:

"Art. 38.08, V.A.C.C.P., provides as follows:

Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause."

A prosecutor's comment on a defendant's failure to testify offends both our State and Federal Constitutions. *Nickens v. State*, 604 S.W.2d 101 (Tex.Cr. App.1980); *Pollard v. State*, 552 S.W.2d 475 (Tex.Cr.App.1977). The language of such a comment must be either manifestly intended, or of such a character that the jury would naturally and necessarily take it to be comment on the defendant's failure to testify. *Griffin v. State*, 554 S.W.2d 688 (Tex.Cr.App.1977); *Hicks v. State*, 525 S.W.2d 177 (Tex.Cr.App. 1975)."

\* \* \* \* \* \*

The prohibition against a comment on the defendant's failure to testify is mandatory and the adverse effect of any reference to the accused's failure to testify is not generally cured by an instruction to the jury. *Johnson v. State*, 611 S.W.2d 649 (Tex.Cr.App.1981); *Overstreet v. State*, 470 S.W.2d 653 (Tex.Cr. App.1971).

The State urges that it was not error for the prosecutor to comment on appellant's failure to express remorse or sorrow since appellant did in fact testify at the guilt stage of the trial. Appellant testified in support of his defensive theory of self-defense. Acceptance of the State's argument would place an accused in the paradoxical position of saying I am

sorry for a crime of which I am not guilty. The end result would be to deny the accused the right to enter a plea of not guilty and make application for a probated sentence.

*Owen v. State*, 656 S.W.2d at 459–60.

In *Dickinson v. State*, 685 S.W.2d 320 (Tex.Crim.App.1984) (en banc), the court reversed a conviction for aggravated rape of a child because the prosecutor argued "at the punishment stage of the trial, that appellant had failed to express in the courtroom 'remorse,' 'shame,' or 'pity' towards or for his victim...." *Dickinson* at 321. Taking the prosecution to task, the court expressed the extent of its disapproval stating:

In sum a prosecuting attorney, though free to strike hard blows, is not at liberty to strike foul ones, either directly or indirectly. *Jackson v. State*, 529 S.W.2d 544, 546 (Tex.Crim.App.1975).

\* \* \* \* \* \*

This Court has often held that when a prosecuting attorney violates the provisions of Art. 38.08, *supra*, and the matter is brought before this court for review, this Court's duty is clear, and the responsibility for the reversal must rest solely upon the prosecuting attorney. *Lankford v. State*, 156 Tex.Cr.R. 113, 239 S.W.2d 394 (1951). Such error is rarely curable by an instruction to the jury to disregard.

\* \* \* \* \* \*

Furthermore, for us to put our stamp of approval on the prosecuting attorney's statements that appellant had not shown the jury that he was remorseful or shameful for what he was accused of committing would amount to overruling what is now axiomatic in our law: that a prosecutor's comment on a defendant's failure to testify offends both our State and Federal Constitutions, as well as our statutory law. *Owen v. State*, 656 S.W.2d 458 (Tex.Cr.App.1983).

*Dickinson*, 685 S.W.2d at 322–23.

Rejecting the State's contention that appellant's demeanor during trial was the fo-

cus of the prosecutor's attack, the court stated:

> We find that the complained of arguments in this cause constitute, not a proper expression upon the appellant's courtroom demeanor, but, instead, constitute indirect comments on the appellant's failure to testify. The necessary and natural effect of the prosecutor's comments, that went to "remorsefulness," "lack of showing of sorrow for the victim," and "failure to exhibit shamefulness," amounted to directing the jury's attention to the failure of the appellant to testify to these various mental states, which, as there is not showing that they were ever unlocked and their secrecy removed, could have only been known by the appellant, or the appellant was the only person who could have given evidence going to these mental states, which would have required him to give up his right of self-incrimination. We are compelled to agree with appellant's counsel that the attempt by the prosecuting attorney not to comment on the appellant's failure to testify, by using the word "demeanor", amounted to a transparent attempt to call the jury's attention to the appellant's invocation of his right to remain silent.

*Dickinson*, 685 S.W.2d at 324–25.

The State and dissent, however, misplace their reliance on *Jones v. State*, 693 S.W.2d 406 (Tex.Crim.App.1985). In *Jones*, after approving *Owen*, the court found a distinction from *Owen*, which they held justified the prosecutor's remark:

> The entire statement in question in this case reads as follows:
>
> '... the defendant hasn't indicated any remorse. [here the defendant's attorney objected to the remark. His objection was sustained. The court then instructed the jury 'that any argument of counsel is not evidence in this case. It is not to be considered as evidence and you are to disregard the statement made by counsel for the state in regards to showing of remorse.'
>
> Counsel for the defense then asked for a mistrial which was overruled.] Ladies

and Gentlemen, the Charge would show you can consider all of the evidence that you have heard before in the guilt innocence phase as well as this phase. The defendant was on the stand. He said, he admitted that he went out there. Dorothy Jones was shot. He admitted that he blamed her for him not having the farm. He told you that he would do anything to get that farm back. He said he would kill for it under the right situation.'

> The statement was intended to reflect upon what the appellant had testified about at the guilt or innocence portion of the trial. As such we cannot find that the language was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify at punishment. The appellant urges us to accept *Owen v. State, supra,* as controlling authority in this case. While the similarities appellant alludes to are well taken, *there is an important distinction between Owen and the instant case. In Owen there was no question that the prosecutor's remarks were manifestly intended to be a comment on the accused's failure to testify.* (emphasis added)

*Jones,* 693 S.W.2d at 408.

While no real distinction exists between *Owen* and the case at bar, there is a real distinction between this case and *Jones.* Where the remarks of the prosecutor in *Jones* could reasonably be interpreted as "intended to reflect upon what the appellant had testified about at the guilt or innocence portion of the trial," there is "no question that the prosecutor's remarks were manifestly intended to be a comment on the accused's failure to testify" during the punishment phase in the case before us. *Jones* at 408.

"[T]he right of self-incrimination does not end with the jury finding the defendant guilty for, as Presiding Judge Onion said in *Brumfield v. State,* [445 S.W.2d 732 (Tex.Cr.App.1968)], [t]he mere finding of guilt does not terminate the privilege against self-incrimination.... the

privilege ceases only when liability to punishment no longer exists...."

*Dickinson*, 685 S.W.2d at 322.

Here, the prosecutor unnecessarily and intentionally violated the court's instruction in the court's charge, a copy of which certainly was before him. The charge specifically admonished the jury not to consider in any way the appellant's choice to remain silent during the punishment phase. Having thus been placed on notice, the prosecution nevertheless ignored it by the improper remarks. "In sum, a prosecutor's attorney, though free to strike hard blows, is not at liberty to strike foul ones, either directly or indirectly. *Jackson v. State*, 529 S.W.2d 544, 546 (Tex.Cr.App.1975)." *Dickinson* at 322. Here, appellant testified during the guilt or innocence phase that he was not guilty of murdering the complainant. As in *Owen*, the prosecutor in the case at bar placed the appellant "in the paradoxical position of saying I am sorry for a crime of which I am not guilty." *Owen*, 656 S.W.2d at 459. The end result was to deny appellant the right to either testify or remain silent during either one or both of the two phases of the trial. The prosecutor here struck a foul blow which requires reversal.

The contention is advanced that this is harmless error. "The test to determine whether or not the error is harmless error is not whether a conviction could have been had without the improper argument, but whether there is a reasonable possibility that the argument complained of might have contributed to the conviction [or the punishment]." *Garrett v. State*, 632 S.W.2d 350, 353–54 (Tex.Crim.App.1982). "Such error [comment about an accused remaining silent] is rarely curable by an instruction to the jury to disregard." *Dickinson*, 685 S.W.2d at 322.

Here, appellant vehemently professed his innocence during a hard fought trial. The State was required to rely on circumstantial evidence considerably in presenting its case, and the case presented by the state cannot be described as overwhelming. Although the record reflects appellant has no prior convictions, the punishment imposed can be considered the maximum punishment permitted for the charge.[1] Under these circumstances, there is a reasonable possibility that the improper remarks of the prosecution pertaining to appellant remaining silent during the punishment phase, might have contributed to the punishment assessed.

Because the error effects the punishment only, we reverse and remand for new trial as provided by art. 44.29(b), Code of Criminal Procedure.

BUTTS, Justice, dissenting.

This is an appeal from a conviction for the offense of murder. A jury found appellant guilty and assessed punishment at 99 years' imprisonment.

Advancing four points of error, appellant first contends that it was error for the trial court not to grant his motion to suppress the [evidence obtained as a result of the] search warrant if the search warrant was issued without probable cause and if the search warrant failed to comply with the requirements of TEX.CODE CRIM.PROC. ANN. art. 18.01(a), (b), (c) (Vernon Supp. 1989). The second and third points of error challenge the sufficiency of the evidence to support the conviction. The last point of error is that appellant's motion for mistrial, following the prosecutor's statement during the jury argument at the punishment phase, should have been granted. The majority reverses the case on this last point. I would overrule the point of error.

In his fourth point of error appellant contends that the prosecutor's arguments constituted error because it was a comment on his failure to testify.

The statement by the prosecutor at the punishment phase was:

Ladies and gentlemen, there are more people involved in this case than just Aaron Litaker. Is the act of deterrence an important consideration to determining what should be done in this case? Certainly that is an importance, too. You know, I think that it would be a very

---

1. TEXAS PENAL CODE § 12.32 (Vernon Supp. 1989).

critical thing if I would hear a defendant get on this witness stand and say yes, I did it and I really am sorry about that and I'm trying to do something to get that straightened out. I'm seeing a doctor or I'm doing this and I know that that—what was done was terrible, and I'm going to do something to get it straight. Well, you don't hear that in this case. That didn't happen.

Defense counsel objected, pointing out there were "very clear instructions not to refer to this defendant's failure to testify." The trial court sustained the objection and instructed the jury to disregard the statement of counsel. Defense counsel moved for a mistrial and was overruled. The trial court then again instructed the jury:

> Again, members of the jury, you are referred to paragraph number eight in the court's charge, and you will not in any way allude to or refer to the fact that the defendant did not testify during the punishment phase of the case during the course of the deliberations. You are so instructed. The motion is overruled.

. . . . .

The prosecutor never returned to the subject.

A prosecutor's comment on a defendant's failure to testify offends both our State and Federal Constitutions. *Short v. State*, 671 S.W.2d 888, 890 (Tex.Crim.App.1984). For a statement to constitute a comment on the failure to testify, the language of such a statement must be either manifestly intended, or of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify. *Id.* The implication that the language used has reference to the defendant must be a necessary one in order for this Court to hold that the statement was a comment on the defendant's failure to testify. *Id.* For an indirect comment to constitute reversible error, it must call for a denial of an assertion of fact or contradictory evidence that only the defendant is in a position to offer. *Id.* (citations omitted).

In the present case the defense vigorously attacked the evidence that was presented by the State and the testimony of the expert witnesses. Appellant testified and denied his guilt. He presented several defense witnesses. The defense theory was that the crime could just as well have been committed by another person whose fingerprints were not identified at the scene, and that the killer might have been the person who was with the deceased on the Mexico bridge or one of the men the deceased had dated. The forensic experts were questioned extensively concerning evidence they did not examine, but which they should have examined, according to appellant. Appellant explained his relationship with the deceased, his encounter with unknown assailants at the apartment of deceased, and his several injuries to his face, body, and hands. His mother, wife, sister, and friends also testified at the punishment phase regarding his reputation as a peaceful and law-abiding person. In fact, the testimony of his female relatives at that stage still addressed appellant's innocence and his inability to commit this kind of crime.

While a prosecutor may comment on a defendant's failure to produce evidence, this is limited in one major respect. *Montoya v. State*, 744 S.W.2d 15, 36 (Tex.Crim. App.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 2887, 101 L.Ed.2d 921 (1988). Such a comment cannot concern the failure to produce evidence of which only the defendant has knowledge. *Id.* (citations omitted) Examples of this kind of evidence would be alibi, why a defendant was in possession of such a large quantity of marihuana, affirmative consent during a sexual attack, and whether an act resulting in conviction for capital murder was done deliberately.

The comment by the prosecutor at the punishment phase in the instant case is an indirect allusion, when it is examined in the total context of the case, including all the evidence presented by appellant at the guilt/innocence phase, addressing the continuing pattern of denial by appellant and the lack of any sign of rehabilitation or deterrence on his part. Moreover, in this case both the mother and wife would have knowledge of any act of contrition or reha-

bilitation of appellant, such as going to see a doctor for treatment. Those two witnesses, both of whom testified at the punishment phase, could have presented this evidence to the jury; in other words, that evidence would not be something of which only the appellant had knowledge and to which only he might testify. We should not hold that the prosecutor's remarks were "manifestly intended" as a comment on appellant's failure to testify or that the jury would have naturally and necessarily taken them to be such.

I would hold that the argument was not of such a nature that the jury would or could not follow the instruction of the trial judge. *See Jones v. State*, 693 S.W.2d 406, 409 (Tex.Crim.App.1985). Therefore, we should further hold that if an error was made, it was harmless error, subsequently and effectively cured by the trial court's instructions to the jury.

Accordingly, I respectfully dissent.