[No. 38162-8-I. Division One. February 17, 1998.]
THE STATE OF WASHINGTON, *Respondent*, v. ERIC H.
HAYDEN, *Appellant*.

101

*Kelly V. Curtin* of *Nielsen, Broman & Associates, P.L.L.C.*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Tod J. Bergstrom, Deputy*, for respondent.

KENNEDY, A.C.J. — Eric H. Hayden appeals his conviction of felony murder in the first degree, contending that the trial court erred in admitting enhanced-fingerprint evi-

dence after conducting a *Frye*[1] hearing and by ordering him to obtain a mental health evaluation and undergo treatment as a condition of his community placement following the completion of his confinement.[2] Finding no error, we affirm.

## FACTS

Dawn Fehring, a 27-year-old student, was found dead on the floor of her Kirkland apartment on Sunday, May 14, 1995. She was discovered nude near the foot of her bed with her top bed sheet and T-shirt wrapped around her head and neck. Bloodstains were found on the carpet near her body and bloody handprints were visible on the fitted bed sheet covering the mattress. An autopsy revealed that Fehring died from asphyxiation sometime the previous Friday evening and that the source of the blood was two tears on her hymen.

During the ensuing investigation, police interviewed occupants of the other apartments in the building, one of whom was appellant Eric Hayden. Hayden became a suspect when he was unable to account for his whereabouts on the night of the murder and seemed nervous during a police interview. He told police that he had been drinking with friends on Friday evening but was unable to identify the friends. He told his girl friend that he was too drunk that evening to remember where he had been.

The Kirkland Police Department took the fitted bed sheet to Daniel Holshue, a King County latent print examiner. Holshue cut out the five areas of the bed sheet that contained the most blood and prints. He then treated the pieces of sheet with a dye stain called amido black that reacted with the protein in the blood, turning the sheet navy blue. Next, he rinsed the pieces of sheet in pure methanol to lighten the background, leaving only the protein stains

---

[1]*Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923).

[2]We treat this second issue in the unpublished portion of this opinion.

dark blue. Finally, he dipped the pieces in distilled water to set the prints. Still, after these chemical processes were completed, the contrast between the latent prints and the pieces of bed sheet was too subtle for Holshue to identify the minimum of eight points of comparison required to make a positive identification.

Holshue took the pieces of sheet to Erik Berg, an expert in enhanced digital imaging at the Tacoma Police Department, for computer enhancement. Berg took computer photographs, or digital images, of the pieces of sheet and then utilized computer software to filter out background patterns and colors to enhance the images so that the prints could be viewed without the background patterns and colors. Using the enhanced photographs of the latent prints, Holshue found twelve points of comparison on one of the fingerprints and more than forty on one of the palm prints. Thus, he concluded that the prints on the bed sheet belonged to Eric Hayden.

On June 5, 1995, the State charged Hayden by information with one count of felony murder in the first degree in violation of RCW 9A.32.030(1)(c). Specifically, it alleged that Hayden committed the crime of rape against Fehring, causing her death in the course of, in furtherance, and in immediate flight from that crime. After an eight-day trial, a jury found Hayden guilty. The court sentenced Hayden within the standard range and ordered him to obtain a written mental health evaluation and complete all treatment recommendations as a condition of his community placement following the completion of his prison sentence. Hayden appeals.

## ANALYSIS

 Our Supreme Court recently reaffirmed its adherence to the *Frye* test to determine admissibility of novel scientific evidence. *State v. Copeland*, 130 Wn.2d 244, 261, 922 P.2d 1304 (1996) (citing *Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923)). Under this test, scientific evidence is admissible if it is generally accepted in

the relevant scientific community, but not admissible if there is a significant dispute between qualified experts as to its validity. *Id.* at 255. Yet, if the evidence does not involve new methods of proof or new scientific principles, then the *Frye* inquiry is not necessary. *State v. Ortiz*, 119 Wn.2d 294, 311, 831 P.2d 1060 (1992). Full acceptance of a process in the relevant scientific community obviates the need for a *Frye* hearing. *State v. Russell*, 125 Wn.2d 24, 41, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129, 115 S. Ct. 2004, 131 L. Ed. 2d 1005 (1995).

Here, the trial court held a *Frye* hearing to determine the admissibility of the prints identified by use of the enhanced digital imaging process. The State presented testimony from two experts, Holshue and Berg, who explained the steps they took to ultimately identify Hayden's palm and fingerprint from the fitted bed sheet. The State also provided the trial court with forensic literature regarding digital image enhancement. Hayden did not present any witnesses at the *Frye* hearing and presented no controverting literature. Based upon the testimony, the trial court found that the amido black chemical dipping process is generally accepted by forensic scientists and that the enhanced digital imaging process is not novel scientific evidence to which the *Frye* test applies. Nonetheless, the court also concluded that the enhanced digital imaging process passed the *Frye* test.

Hayden does not challenge the trial court's rulings with respect to the amido black chemical dipping process. Neither does he challenge the courts rulings under ER 702, that both Holshue and Berg were qualified as experts and that their testimonies would be helpful to the trier of fact. He argues only that the enhanced digital imaging process has not obtained general acceptance in the relevant scientific community because its use for this purpose is recent and because the computer programs used to enhance the images were not designed for forensic science. He maintains that the procedure used to produce the enhanced prints did not satisfy the *Frye* standard, and, therefore, that the trial court erred in admitting the evidence. The State responds

that enhanced digital imaging is not novel. It argues further that even if the process is novel, it is accepted in the latent print examiner's scientific community, thereby satisfying the *Frye* standard.

A. Novel Scientific Evidence

In 1994, the enhanced digital imaging process was described by Berg, the State's digital imaging expert, as "a totally new process based upon research and development done in the late 1960's and early 1970's for the space program." E. Berg, *Latent Image Processing - A Changing Technology*, PACIFIC NW INT'L ASS'N FOR IDENTIFICATION EXAMINER, 2d Quarter 1994. This and other literature presented reflects that the technology used to enhance photographs of latent prints evolved from jet propulsion laboratories in the NASA space program to isolate galaxies and receive signals from satellites. The Tacoma Police Department began using digital imaging technology in forensics in January of 1995.

The State contends that because the underlying scientific theory behind enhanced digital imaging is not new, its application to forensic science does not constitute a novel process; it suggests that it was merely the high cost of the process that prevented law enforcement organizations from using it earlier. Yet, a 1987 article from the FBI Academy's International Symposium on Latent Prints observed:

> Latent print examiners across the country react differently when image enhancement of latent prints is discussed. Often, the initial reaction is one of disapproval. The concern is that nonexistent detail is added to the latent print. Image enhancement techniques are not designed to create detail but to improve images for human interpretation.

A.L. McRoberts, *Digital Image Processing as a Means of Enhancing Latent Fingerprints*, PROC. OF THE INT'L FORENSIC SYMP. ON LATENT PRINTS, FBI, July 7-10, 1987, at 166. Although this article may not be reflective of the current latent print examiner community because it was written 10 years ago, it indicates that skepticism, in addition to high costs, may have contributed to the delay in the use of digital image enhancement in forensic science.

In support of its argument that the process is not novel, the State relies further upon *State v. Noltie*, 57 Wn. App. 21, 786 P.2d 332 (1990), *aff'd*, 116 Wn.2d 831, 809 P.2d 190 (1991). At issue in *Noltie* was the admissibility of enlarged views of a child abuse victim's sex organs obtained using a colposcope, a microscope developed and used to diagnose cancer. *Id.* at 28-29. This court concluded: "We find no basis for Noltie's contention that colposcopy constitutes a 'novel' field or scientific technique, even though its use in child abuse cases may be relatively recent." *Id.* at 29. It called the colposcope "a magnifying glass with a fancy name" and concluded that it was not subject to the *Frye* test. *Id.* at 29-30 (citation omitted).

In *Noltie*, this court cited three cases from other jurisdictions that agreed with its holding. *Noltie*, 57 Wn. App. at 29-30 (citing one Kentucky case and two California cases). In the instant matter, no court has ruled in a published appellate decision on the admissibility of latent prints processed by enhanced digital imaging.

The only published case that mentions this process is *Litaker v. Texas*, 784 S.W.2d 739 (Tex. Crim. App. 1990). In *Litaker*, the Texas Court of Criminal Appeals rejected a sufficiency-of-the-evidence challenge to a conviction involving amido black blood treatment and a computer image enhancing process. *Litaker*, 784 S.W.2d at 742. A retired United States Army latent print examiner testified as an expert at trial, matching the enhanced latent print with a known print. *Id.* Because admissibility of this evidence was not challenged in *Litaker*, the court did not discuss the processes in detail. Nonetheless, *Litaker* indicates that the enhanced digital imaging process was utilized in at least one court as early as 1990.

Certainly digital photography is not a novel process. Neither is the use of computer software to enhance images. It is only the forensic use of these tools that is relatively new.

Although we find the State's argument that the process is not novel to be persuasive, because this is a question of first impression we analyze the admissibility of the evidence under the *Frye* standard.

B. The *Frye* Test

██ Review of admissibility of evidence under the *Frye* test is de novo. *Copeland*, 130 Wn.2d at 261. Because no Washington court, and no other court in a published opinion, has determined that the digitally enhanced print process satisfies the *Frye* test, this court must examine the record, the available literature and cases from other jurisdictions to determine whether enhanced digital imaging is generally accepted in the relevant scientific community. *State v. Cauthron*, 120 Wn.2d 879, 888, 846 P.2d 502 (1993).

To demonstrate that the enhanced digital imaging process is accepted in the relevant scientific community, the State presented the testimony of two expert witnesses at trial and attached five articles from forensic journals to its trial brief. Although Hayden asserts: "[I]t is impossible to conclude that [this] process has obtained general acceptance in the relevant scientific community," App. Br. at 8, he provided no witnesses or documentation to contradict the State's experts at the trial court level and provides no literature or other evidence to this court that contradicts the evidence and literature presented by the State, in spite of the fact that we are not limited to the scientific literature that was before the trial court.

Berg is employed by the Tacoma Police Department as a forensic specialist and had spent the two-and-a-half years prior to this trial specializing in enhanced digital imaging and its application in the field of forensic science. He is the author of two articles on the enhanced digital imaging process: *Latent Image Processing — A Changing Technology*, PACIFIC NW INT'L ASS'N FOR IDENTIFICATION EXAMINER, 2d Quarter 1994, and *The Digital Future of Investigations*, L. ENFORCEMENT TECH. Aug. 1995.

At trial and in his articles, Berg explained the process of enhanced digital imaging in detail. *See also* B.E. Dalrymple & T. Menzies, *Computer Enhancement of Evidence Through Background Noise Suppression*, 39 J. FORENSIC SCI., Mar. 1994. The advantage of digital photographs, rather than analogue film photographs, is that digital photography can capture approximately 16 million different colors and can differentiate between 256 shades of gray. Digital photographs work with light sensitivity, just like film photographs, except the computer uses a chip and a hard drive in place of the camera's film. At trial, Berg testified that there is no subjectivity in this process.

The digital photographs are enhanced using software that improves sharpness and image contrast. In addition, pattern and color isolation filters remove interfering colors and background patterns. This is a subtractive process in which elements are removed or reduced; nothing is added. At trial, Berg testified that the software he used prevented him from adding to, changing, or destroying the original image. In contrast with "image restoration," a process in which things that are not there are added based upon preconceived ideas about what the end result should look like, "image enhancement" merely makes what is there more usable. *See* William J. Watling, *Using the FFT in Forensic Digital Image Enhancement*, 43 J. FORENSIC IDENT. 574 (1993).

■ ■ On cross-examination at trial, Berg admitted this was the first time he had ever taken a latent print off of a fabric. Still, nothing in the literature presented to the trial court and for this appeal indicates that the validity of the process depends upon the nature of the material upon which the print is found. We have examined the fabric and the digitally enhanced photographs in the course of our review. It is clear even to the untrained eye that the fabric contains a handprint and that nothing appears in the digitally enhanced photograph that was not present on the fabric. Rather, the image of the handprint is merely enhanced by removing background detail unrelated to the

points of identification by which the handprint was identified as Hayden's. The evidence in the record supports the trial court's unchallenged findings that the technique utilized by Berg has a reliability factor of 100 percent and a zero percent margin of error and that the results are visually verifiable and could be easily duplicated by another expert using his or her own digital camera and appropriate computer software.

The literature presented by the State indicates that digital image processing has been used as a means of enhancing latent fingerprints by the Los Angeles County Sheriff's Department since at least 1987. *See* A.L. McRoberts, *Digital Image Processing as a Means of Enhancing Latent Fingerprints*, PROC. OF THE INT'L FORENSIC SYMP. ON LATENT PRINTS, July 7-10, 1987, at 165-66. Because there does not appear to be a significant dispute among qualified experts as to the validity of enhanced digital imaging *performed by qualified experts using appropriate software*, we conclude that the process is generally accepted in the relevant scientific community. Accordingly, we reject Hayden's contention that the trial court erred by admitting the challenged evidence and affirm his conviction.

A majority of the panel having determined that the remainder of this opinion lacks precedential value and will not be printed in the Washington Appellate Reports but will be filed of public record in accord with RCW 2.06.040, it is so ordered.

GROSSE and AGID, JJ., concur.