(134 P.3d 19)

No. 93,962

STATE OF KANSAS, *Appellee*, v. RICHARD A. BLANCHETTE, *Appellant*.

Opinion filed May 19, 2006.

*Heather Cessna*, of Kansas Appellate Defender Office, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Nola Tedesco Foulston*, district attorney, and *Phill Kline*, attorney general, for appellee.

Before GREEN, P.J., MALONE and BUSER, JJ.

MALONE, J.: Richard A. Blanchette appeals his convictions of rape and aggravated indecent liberties with a child. At trial, the child victim testified by closed-circuit television pursuant to K.S.A. 22-3434. The primary issue on appeal is whether K.S.A. 22-3434 violates a defendant's constitutional right to confrontation of witnesses. In the alternative, Blanchette claims the State failed to demonstrate that closed-circuit testimony was necessary in his case. Blanchette also claims the trial court erred in overruling his motion to have the child victim interviewed by a psychologist. Blanchette also claims his convictions of alternative counts of rape and aggravated indecent liberties with a child were multiplicitous, the trial

court erred in admitting photographs into evidence, and he was denied a fair trial due to prosecutorial misconduct and cumulative error.

### Factual and procedural background

We will review the facts in considerable detail. In 2000, Paula Iverson met Blanchette through a mutual acquaintance, Brooke Osler. In 2003, Iverson and her daughter, J.I., d/o/b August 11, 1999, temporarily moved in with Blanchette while their home was being refurbished. Iverson and Blanchette were never romantically involved.

On February 9, 2004, Osler came over to Iverson's house and asked Iverson to accompany her to the hospital because she believed she was going into labor. Iverson contacted her family and J.I.'s father to see if anyone could watch J.I., but she was not able to find anyone to baby-sit. Blanchette was present at Iverson's house working on the phone, so Iverson asked Blanchette if he could watch J.I. Blanchette agreed and he took J.I. back to his house.

Iverson drove Osler to the hospital. The contractions proved to be a false alarm, and Osler was sent home. When Iverson and Osler arrived at Blanchette's house to pick up J.I., Blanchette was in the dining room watching television, and J.I. was asleep in Blanchette's bedroom. Blanchette, Iverson, and Osler talked for about 30 to 45 minutes. Blanchette told Iverson that J.I. had fallen asleep on his couch. According to Blanchette, when he picked J.I. up to move her into his bedroom, she was "freaking out" and told him not to touch her "bum-bum." Iverson testified that "bum-bum" was not a word that J.I. ever used to describe any part of her body. Blanchette advised Iverson that he thought she should have J.I. examined to find out if anyone had been touching her inappropriately.

Iverson went to the bedroom to get J.I. When she picked her up, J.I. wrapped her arms around Iverson's neck and clung to her tightly, which was unusual behavior for J.I. In the car, Iverson attempted to strap J.I. into her car seat. When she separated J.I.'s legs to get the buckle, J.I. started to cry and said her "tee tee" hurt. "Tee tee" was the word J.I. used for her vagina. As they drove to

Osler's house, J.I. continued to cry. Iverson asked J.I. if anyone had touched her "tee tee," and J.I. responded that Blanchette had hurt her "tee tee." When they reached Osler's house, Iverson took J.I. inside and discovered blood on her underwear.

Iverson immediately contacted the police department and took J.I. to the hospital. She was sent to a second hospital where a sexual assault examination was conducted. Vickie Tucker, the sexual assault nurse examiner (SANE), noted injuries to J.I.'s hymen at the 3 o'clock and 9 o'clock positions as well as between the 6 o'clock and 8 o'clock positions. According to Tucker, the nature of J.I.'s injuries were typical of blunt force penetration. J.I's injuries were internal; there were no external injuries to her genitalia.

Two days later, DeShonn Larkins, a detective with the exploited/missing child unit, interviewed J.I. J.I. told Larkins that Blanchette had touched her "tee tee" with his finger while she was on the couch at his house. The following day, Larkins asked Blanchette to come to Larkins' office for an interview. Blanchette was advised of his *Miranda* rights and agreed to speak with Larkins. Blanchette acknowledged that he had watched J.I. at his house, but he denied that he had touched J.I. inappropriately. On February 17, 2004, Blanchette was charged with one count of rape. The charge was eventually amended to include an alternative count of aggravated indecent liberties with a child.

On March 15, 2004, J.I. returned to the hospital for a follow-up examination. J.I. told the SANE nurse, Diana Schunn, that Blanchette had hurt her "tee tee" with his "bad finger." On March 17, 2004, Larkins again met with J.I. for another interview. J.I.'s statements were consistent with those made at the first interview. J.I. told Larkins that Blanchette had pulled her pants down and had touched her "tee tee" with his finger.

On April 1, 2004, the trial court conducted a preliminary hearing. The State called three witnesses: Iverson, J.I., and Larkins. Iverson testified regarding J.I.'s behavior, the events of the evening when Blanchette watched J.I., and J.I.'s statements that Blanchette had hurt her "tee tee." Larkins testified about the custodial interview conducted with Blanchette where he acknowledged he had watched J.I. at his house on February 9, 2004.

J.I.'s testimony was conducted in the judge's chambers in order to provide a setting that would be less frightening for J.I. Blanchette was present, but he was seated behind J.I. so she could not see him as she testified. J.I. testified that Blanchette had touched her "tee tee" with his finger. J.I. also indicated on a diagram of a little girl the location of Blanchette's contact with her genitalia. J.I. referred to Blanchette as "Richard," but it was established she only knew one person named Richard. On cross-examination, J.I. confirmed that Blanchette had touched her, but she said the touching happened outside the house. J.I. then began to answer every question negatively. She said she was tired, and defense counsel indicated he had no further questions. On redirect examination, the prosecutor asked J.I. to stand up so that she could see where Blanchette was sitting. The prosecutor asked J.I. to identify Blanchette, but she said she did not want to do so.

Based upon J.I.'s behavior at the preliminary hearing, the State filed a motion to allow J.I. to testify at trial by closed-circuit television pursuant to K.S.A. 22-3434 because it would be too traumatic for J.I. to testify in Blanchette's presence. In response, Blanchette filed a motion requesting permission to have J.I. submit to an independent psychological evaluation. The trial court heard oral arguments on the motion for an independent psychological evaluation and requested briefs from both parties. Ultimately, the trial court denied the motion. The trial court found J.I.'s therapist to be a neutral therapist who was not connected to or under any influence by the State.

On November 12, 2004, the trial court conducted a hearing on the State's motion to present trial testimony pursuant to K.S.A. 22-3434. Gail Bussart, a licensed social worker, testified regarding her involvement in nondirective play therapy with J.I. Bussart began seeing J.I. on March 1, 2004, and conducted 24 play therapy sessions with J.I. through November 2004. Bussart testified that J.I. talked about how Blanchette had hurt her. J.I. also expressed safety issues to Bussart and expressed a fear that her mother would not keep her safe from Blanchette. In the only directed play session, Bussart attempted to prepare J.I. for testifying in court. When Bussart began to explain how J.I. would need to talk to a judge who

would keep her safe, J.I. became very frightened and cowered. She did not want to talk to Bussart about testifying in court. Bussart testified that she would not expect J.I. to be able to answer questions about the case with Blanchette present in court.

Dr. Molly Allen, a licensed psychologist, testified as a witness on behalf of Blanchette. Allen had not spent any time with J.I. since Blanchette's motion for an evaluation had been denied. Allen opined that testifying in court is stressful to a child, but it did not have to be a traumatic event. She said that "[w]ith enough preparation and possibly therapy in place before and after the court appearance, a lot of kids can process that sort of stress and be able to put it into context." On cross-examination, Allen admitted that testifying in court could be traumatic, which might manifest itself in disassociation, emotional meltdowns, extreme regression, developmental delays, recurrent nightmares, flashbacks, and rumination over the events.

J.I. was the next witness at the hearing. Her testimony was taken in the courtroom, but outside Blanchette's presence. J.I.'s grandfather was allowed to sit beside her during her testimony. J.I. was able to answer several preliminary questions and testified that Blanchette had touched her on her "tee tee." J.I. testified that if Blanchette came into the room, she would want to go home. J.I. told the court that it made her sad to talk about what Blanchette had done to her.

Iverson was the final witness at the hearing. She testified that after the preliminary hearing, J.I. was emotionally upset and clung to her family members. She said that J.I. was crying, screaming, kicking, paranoid, and did not want to get into her car seat. Within a half hour of the hearing, J.I. told her mother that she was afraid Blanchette was going to come get her.

The trial court took the matter under advisement and ruled on the motion on the morning of the trial. The trial court noted that J.I. answered questions about Blanchette at the preliminary hearing, but refused to identify Blanchette once she knew he was in the room. The trial court noted that Iverson testified that J.I. was very upset following the preliminary hearing. The trial court reviewed the evidence at the pretrial hearing and noted that J.I. said

she would want to go home if Blanchette was in the courtroom. The trial court noted that Bussart was of the opinion that J.I. should not testify in Blanchette's presence because the trauma could be of a permanent nature. The trial court concluded by finding:

"Taking everything into consideration, the Court finds that the evidence establishes by clear and convincing evidence that to require the child, who is the alleged victim, to testify in open court in the presence of the defendant will so traumatize the child as to prevent the child from reasonably communicating to the jury or render the child available to testify.

"The evidence presented establishes by clear and convincing evidence that the child witness will be traumatized not by the courtroom, generally, but by the presence of the defendant.

"The Court further finds that the evidence establishes by clear and convincing evidence that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis*. The evidence presented shows the emotional distress to be more than mere nervousness or excitement or some reluctance to testify. The evidence presented shows that the child witness has suffered and will suffer a freeze presence if required to testify in the presence of the defendant. The evidence establishes that the presence of the defendant will retraumatize the child permanently with long-lasting negative effects, which could manifest later in life.

"Based on the Court's findings, the Court concludes that the use of the one-way closed circuit TV authorized by K.S.A. 22-3434 is necessary to protect the welfare of the child witness in this case."

Blanchette's trial commenced on November 16, 2004. J.I. testified via a one-way closed-circuit television. Her testimony was taken in the judge's chambers with the prosecutor and defense counsel present. J.I.'s grandfather was also allowed in the chambers, but he did not communicate with J.I. during her testimony. There was a live feed to the courtroom where J.I.'s testimony could be viewed and heard simultaneously by Blanchette, the court, and the jury. The camera and the microphone were situated in such a manner whereby J.I. was unaware she was being recorded, and there was no technician present in the chambers. During J.I.'s testimony, the trial court was able to communicate directly with the attorneys and was able to contemporaneously rule on any objections. Blanchette was allowed to confer with his counsel as often as he wanted during J.I.'s testimony.

J.I. testified without incident. She described the evening at Blanchette's house and testified how Blanchette had touched her "tee tee" with his finger. J.I. answered all questions she was asked on cross-examination. Iverson, Osler, Larkins, and the SANE nurses also testified for the State. Blanchette testified in his own defense and denied touching J.I. inappropriately.

The jury found Blanchette guilty of rape and also guilty of the alternative count of aggravated indecent liberties with a child. At sentencing, the trial court adjudged Blanchette guilty of both offenses. The trial court pronounced a sentence for both offenses but "declined to impose" the sentence for aggravated indecent liberties with a child because it was an alternative charge. Blanchette timely appeals.

### Constitutionality of K.S.A. 22-3434

Blanchette first claims K.S.A. 22-3434 is unconstitutional as it contravenes the Confrontation Clause of the Sixth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. Blanchette rests his argument upon the holding in *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004).

Whether a defendant's right to confrontation of witnesses has been violated is a question of law subject to unlimited review. *State v. Saleem*, 267 Kan. 100, 107, 977 P.2d 921 (1999).

"The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken it must clearly appear the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it, and if there is any reasonable way to construe the statute as constitutionally valid, that should be done." *State v. Martis*, 277 Kan. 267, 298, 83 P.3d 1216 (2004).

K.S.A. 22-3434 provides, in part:

"(a) On motion of the attorney for any party to a criminal proceeding in which a child less than 13 years of age is alleged to be a victim of the crime, subject to the conditions of subsection (b), the court may order that the testimony of the child be taken:

(1) In a room other than the courtroom and be televised by closed-circuit equipment in the courtroom to be viewed by the court and the finder of fact in the proceeding; or

. . . .

"(b) The state must establish by clear and convincing evidence that to require the child who is the alleged victim to testify in open court will so traumatize the child as to prevent the child from reasonably communicating to the jury or render the child unavailable to testify. The court shall make such an individualized finding before the state is permitted to proceed under this section.

"(c) At the taking of testimony under this section:

(1) Only the attorneys for the defendant, the state and the child, any person whose presence would contribute to the welfare and well-being of the child and persons necessary to operate the recording or closed-circuit equipment may be present in the room with the child during the child's testimony;

(2) only the attorneys may question the child;

. . . .

(4) the court shall permit the defendant to observe and hear the testimony of the child in person, but shall ensure that the child cannot hear or see the defendant.

"(d) If the testimony of a child is taken as provided by this section, the child shall not be compelled to testify in court during the proceeding."

The use of closed-circuit television testimony is not unique to Kansas. The State cites to the statutes of 21 other states which are similar to K.S.A. 22-3434.

The constitutionality of K.S.A. 22-3434 was previously upheld by the Kansas Supreme Court against a Confrontation Clause challenge in *State v. Chisholm*, 245 Kan. 145, 777 P.2d 753 (1989) (*Chisholm I*). The *Chisholm* court recognized the fundamental right of a defendant to confront a witness in a criminal trial is not absolute and has exceptions where necessary to further an important public policy. 245 Kan. at 150. The court permitted the use of closed-circuit television testimony and held:

"A defendant in a sexual abuse trial is not denied his constitutional right of confrontation where the child-victim witness testifies via closed-circuit television, pursuant to K.S.A. 22-3434, provided the trial court makes an individualized finding that the child-victim witness would suffer trauma as a result of giving in-court, face-to-face testimony." 245 Kan. 145, Syl. ¶ 4.

In *Maryland v. Craig*, 497 U.S. 836, 111 L. Ed. 2d 666, 110 S. Ct. 3157 (1990), the United States Supreme Court upheld the constitutionality of a Maryland statute almost identical to K.S.A. 22-3434. The *Craig* Court noted that face-to-face confrontation with witnesses is not an indispensable element of the Sixth Amend-

ment's confrontation guarantee. 497 U.S. at 849-50. The Court found it significant that the Maryland statute preserved the essence of confrontation by requiring the child witness to testify under oath, subject to full cross-examination, and by allowing the judge, jury, and the defendant to view the witness' demeanor during the testimony. 497 U.S. at 851. The Court recognized that the State's interest in protecting the well-being of a child is a compelling public policy which could outweigh a defendant's confrontation rights if the State made an adequate, fact-driven showing of necessity. The Court concluded:

"[W]here necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit the use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation." 497 U.S. at 857.

In *State v. Chisholm*, 250 Kan. 153, 825 P.2d 147 (1992) (*Chisholm II*), the Kansas Supreme Court again addressed a challenge that K.S.A. 22-3434 violated the defendant's right of confrontation. The court again upheld the statute by reading its provisions in conformity with the United States Supreme Court opinion in *Craig*. 250 Kan. at 166. Based on *Craig*, Kansas adopted the following standard for the use of closed-circuit televison for child-victim witness testimony pursuant to K.S.A. 22-3434:

"A defendant in a sexual abuse trial is not denied the constitutional right to confrontation where the child-victim witness testifies via closed-circuit television, pursuant to K.S.A. 22-3434, provided the trial court (1) hears evidence and determines use of the one-way closed-circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify; (2) finds that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant; and (3) finds that the emotional distress suffered by the child witness in the presence of the defendant is more than de minimis, *i.e.*, more than mere nervousness or excitement or some reluctance to testify." 250 Kan. at 166.

A Confrontation Clause issue was again addressed by the Supreme Court in *Crawford*, which Blanchette claims abrogates the Court's holding in *Craig*. The issue in *Crawford* involved a hearsay

exception, not closed-circuit television testimony. The defendant was charged with assault and attempted murder arising from a stabbing incident. At trial, the State was allowed to play a tape-recorded statement in which the defendant's wife, who did not testify at trial, had described the stabbing incident to the police. The Supreme Court determined the playing of the tape-recorded statement violated the defendant's Sixth Amendment right to be confronted by the witnesses against him. The Court held that out-of-court testimonial statements by a witness are barred under the Confrontation Clause unless the witness is unavailable and the defendant had the prior opportunity to cross-examine the witness. *Crawford*, 541 U.S. at 59. The Court declined to follow *Ohio v. Roberts*, 448 U.S. 56, 63, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980), which had allowed the hearsay testimony of an unavailable witness provided the testimony fit within a firmly rooted hearsay exception or otherwise contained adequate indicia of reliability. *Crawford*, 541 U.S. at 63-65.

Blanchette argues that K.S.A. 22-3434 is unconstitutional under *Crawford* because the language of K.S.A. 22-3434(b) permits closed-circuit television testimony when the court finds the defendant's presence with the child victim in court will so traumatize the child as to prevent the child from reasonably communicating to the jury *or* renders the child unavailable to testify. Blanchette argues the "or" in the statute allows the court to permit a child to testify without finding the child is unavailable, as is required by *Crawford*. However, this argument misses the point that when closed-circuit television testimony is permitted under K.S.A. 22-3434, the child victim is available and subject to cross-examination. The holding in *Crawford* is limited to testimonial hearsay where the defendant is denied an opportunity to cross-examine the witness, so *Crawford* should not apply to closed-circuit television testimony.

In *Crawford,* the majority did not overrule or even mention *Craig.* Several post-*Crawford* decisions have continued to uphold the constitutionality of closed-circuit television testimony against Confrontation Clause challenges. In *United States v. Kappell,* 418 F.3d 550 (6th Cir. 2005), *cert. denied* 547 U.S. 1056 (2006), the

defendant was convicted of the sexual abuse of two minor children. He argued that his confrontation rights were violated when the child witnesses were permitted to testify via closed-circuit television. The court found the Confrontation Clause was not violated because the children provided direct testimony and the defendant was afforded the opportunity to cross-examine the witnesses. 418 F.3d at 554-56. The court analyzed the issue in light of the decision in *Crawford* but concluded:

"*Crawford* thus involved the admissibility under the Confrontation Clause of recorded testimonial statements of a person who did not testify at trial. The holding in *Crawford* was that such statements, regardless of their reliability, are not admissible unless the defendant was able to cross-examine their maker. In the present case, in sharp contrast, the two witnesses (the children) did testify and were cross-examined." 418 F.3d at 555.

In *State v. Henriod*, 131 P.3d 232 (Utah 2006), the defendant was charged with six counts of aggravated sexual abuse of a child. The district court refused to permit closed-circuit television testimony in reliance upon the *Crawford* decision. The Utah Supreme Court reversed, rejecting the defendant's argument that *Crawford* abrogated *Craig*. The court concluded: "Because we believe that *Craig*, not *Crawford*, is controlling, we find that the district court made an error of law, and therefore committed an abuse of discretion, when it held that *Crawford* prevented a child from testifying via closed circuit television." 131 P.3d at 237-38; see also *Williams v. United States*, 859 A.2d 130 (D.C. 2004) (taking 5-year-old victim's testimony via closed-circuit television was warranted); *Ahmed v. United States*, 856 A.2d 560 (D.C. 2004) (defendant's confrontation rights were not violated when the trial court allowed child victim to testify outside the presence of the defendant via closed-circuit television); *Barnes v. State*, 165 S.W.3d 75 (Tex. App. 2005) (record supported constitutionally required findings necessary for minor child to testify via closed-circuit television).

In line with *post-Crawford* decisions from other courts, we reject Blanchette's argument that K.S.A. 22-3434 is unconstitutional based on *Crawford*. Closed-circuit television testimony differs from testimonial hearsay because the witness is available and sub-

ject to cross-examination. In this case, J.I. was a full participant in Blanchette's trial and was subject to cross-examination in full view of Blanchette and the jury. The constitutionality of K.S.A. 22-3434 does not rest upon the *Roberts* "reliability" test which was rejected by the Court in *Crawford*. *Craig* and *Chisholm* are still good law and control the determination that K.S.A. 22-3434 does not violate the Confrontation Clause of the Sixth Amendment.

In the alternative, Blanchette argues that K.S.A. 22-3434 violates § 10 of the Kansas Constitution Bill of Rights. Blanchette argues the Kansas Constitution is more explicit than the Sixth Amendment regarding the right of confrontation. The Sixth Amendment states the accused shall have the right "to be confronted with the witnesses against him." Section 10 of the Kansas Constitution Bill of Rights states the accused shall have the right "to meet the witness face to face."

While the Kansas Supreme Court may interpret the Kansas Constitution in a manner different than the United States Constitution has been construed, it has not traditionally done so. *State v. Kleypas*, 272 Kan. 894, 1032, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002). In *State v. Busse*, 231 Kan. 108, 110, 642 P.2d 972 (1982), the Kansas Supreme Court stated the protections given under both constitutions with regard to confronting witnesses are the same.

"It has long been recognized . . . that the right of confrontation under the United States Constitution and the right to meet the witnesses 'face to face' under Section 10 of the Kansas Bill of Rights are satisfied when defendant has had an opportunity to cross-examine the witnesses against him. [Citations omitted.]" 231 Kan. at 111.

Also, as previously discussed, the Kansas Supreme Court has upheld the constitutionality of K.S.A. 22-3434 despite the "face to face" language contained in § 10 of the Kansas Constitution Bill of Rights. *Chisholm*, 250 Kan. at 166. As long as the standards of *Craig* and *Chisholm* are satisfied in presenting the evidence, closed-circuit television testimony of a child victim does not contravene the defendant's confrontation rights. Blanchette's argument that K.S.A. 22-3434 violates the Kansas Constitution is without merit.

*Compliance with K.S.A. 22-3434*

Assuming K.S.A. 22-3434 is constitutional, Blanchette claims the State did not meet its burden in demonstrating that closed-circuit television testimony was necessary in his case. Blanchette also contends the trial court failed to make the necessary findings to warrant the use of closed-circuit television testimony.

Generally, the standard of review pertaining to a trial court's admission or exclusion of evidence is abuse of discretion. *State v. Holmes*, 278 Kan. 603, 625, 102 P.3d 406 (2004). However, where statutory interpretation is involved, an appellate court's review is unlimited. *State v. Maass*, 275 Kan. 328, 330, 64 P.3d 382 (2003).

In order to introduce closed-circuit television testimony of a child victim in a criminal proceeding, the State must establish by clear and convincing evidence that the defendant's presence with the child in court will so traumatize the child as to prevent the child from reasonably communicating to the jury or render the child unavailable to testify. K.S.A. 22-3434(b). In making this determination, the trial court must: (1) hear evidence and determine use of one-way closed-circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify; (2) find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant; and (3) find that the emotional distress suffered by the child witness in the presence of the defendant is more than de minimis, *i.e.*, more than mere nervousness or excitement or some reluctance to testify. *Chisholm*, 250 Kan. at 166.

In Blanchette's case, the trial court held a pretrial hearing in which extensive evidence was presented. Bussart testified about J.I.'s fear of Blanchette and her preoccupation with being safe from Blanchette. Bussart testified it was her opinion that J.I. would be traumatized if compelled to testify in Blanchette's presence and the trauma could have an impact on her behavior and emotional development later in life. Blanchette's expert, Allen, admitted in cross-examination that testifying in court could be traumatic, which might manifest itself in disassociation, emotional meltdowns, extreme regression, developmental delays, recurrent nightmares,

flashbacks, and rumination over the events. J.I.'s behavior showed her reluctance to be with Blanchette. She testified that she would want to go home if Blanchette was allowed in the courtroom. Iverson testified that J.I. showed signs of extreme emotional distress after the preliminary hearing. J.I. had told her mother that she was afraid Blanchette was going to come and get her.

Blanchette argues J.I.'s reluctance to discuss the incident was not related to Blanchette's presence. He asserts it was the courtroom in general that produced the trauma. This argument is not supported by the evidence. At the preliminary hearing, J.I. testified in the judge's chambers with Blanchette situated outside her line of vision. She was able to answer the questions and testified that Blanchette touched her "tee tee." However, J.I.'s demeanor and behavior changed when she realized that Blanchette was present in the room. At that point, J.I. would not get out of her chair to identify Blanchette, and she did not respond to any further questions.

After considering all the evidence presented at the hearing, the trial court found the use of the closed-circuit television testimony was necessary to protect J.I.'s welfare. Further, the trial court made the specific finding that "[t]he evidence presented establishes by clear and convincing evidence that the child witness will be traumatized not by the courtroom, generally, but by the presence of the defendant." The trial court noted that Bussart felt as if J.I. would "freeze" or "cower" if forced to testify in Blanchette's presence and would suffer permanent trauma resulting from the incident. Finally, the trial court made the required finding that the emotional distress suffered by J.I. in the presence of Blanchette was more than de minimis. The trial court concluded that to require J.I. to testify in open court in the presence of Blanchette would so traumatize J.I. as to prevent her from reasonably communicating to the jury or render J.I. unavailable to testify.

In *State v. Albert*, 13 Kan. App. 2d 671, 675-76, 778 P.2d 386 (1986), this court upheld the use of closed-circuit televison testimony pursuant to K.S.A 22-3434. A social worker had testified before the trial court that the child victim would be unable to testify in the presence of the defendant in any degree of detail. The child

had recently been diagnosed with a severe ulcer that could be aggravated by testifying. The social worker testified the child still had trouble discussing the incident in counseling sessions and cried when the possibility of her testimony was discussed. The trial court stated it was reluctant to bring in a young witness just to see if she would freeze and fall apart on the stand. The trial court expressed confidence in the social worker's expertise in making the judgment about the child's testimony.

The quality and quantity of evidence presented in Blanchette's case greatly exceeded the evidence relied upon by the court in *Albert*. Also, the trial court's findings in Blanchette's case were far more particular than the trial court's findings in *Albert*. We conclude the State met its burden in demonstrating that closed-circuit television testimony was necessary in this case. We also conclude the trial court made sufficient findings required by statute and case law to permit the admission of the child victim's testimony. Accordingly, the trial court did not err in admitting J.I.'s closed-circuit television testimony pursuant to K.S.A. 22-3434.

### Motion for independent psychologist

Next, Blanchette claims the trial court erred in overruling his motion to have J.I. interviewed by an independent psychologist. Blanchette asserts the issue involves statutory interpretation and the standard of review is unlimited. However, K.S.A. 22-3434 does not require or even suggest that a defendant has a right to subject the child-victim witness to an independent psychological examination prior to a finding that closed-circuit television testimony can be utilized. Resolution of this issue does not involve statutory interpretation.

The correct standard of review for the denial of an independent psychological examination is abuse of discretion. *State v. Gregg*, 226 Kan. 481, 489, 602 P.2d 85 (1979).

"A trial court's denial of a defendant's motion to compel the victim, who is not a party in the State's criminal action but is often referred to as the complaining witness or complainant, in a sex abuse case to undergo a psychological examination is reviewed for abuse of discretion. [Citations omitted.] The party who asserts the court abused its discretion bears the burden of showing such abuse. [Citation omitted.]" *State v. McIntosh*, 274 Kan. 939, 941, 58 P.3d 716 (2002).

Prior to the K.S.A. 22-3434 hearing, Blanchette filed a motion requesting that J.I. submit to an independent psychological evaluation. The trial court heard oral arguments on the motion and requested briefs from both parties. Ultimately, the trial court denied the motion. The trial court found J.I.'s therapist to be a neutral therapist who was not connected to or under any influence by the State.

An accused is only entitled to compel an independent psychological evaluation of a victim if the accused can establish a compelling reason for the examination. *State v. Price*, 275 Kan. 78, 80, 61 P.3d 676 (2003). There are several factors the trial court should consider in determining whether a psychological evaluation is warranted:

"(1) whether the victim demonstrates mental instability, (2) whether the victim demonstrates a lack of veracity, (3) whether similar charges by the victim against others are proven to be false, (4) whether the defendant's motion for a psychological evaluation of the victim appeared to be a fishing expedition, (5) whether anything unusual results following the questioning of the victim's understanding of telling the truth, and (6) whether there are any other reasons why the victim should be evaluated." 275 Kan. at 84.

Here, J.I. established a relationship with her therapist, Bussart, soon after the incident and continued to see her regularly until the time of trial. Bussart was not an expert secured by the State to conduct an examination of J.I. for the purposes of the hearing. Bussart was a neutral witness who could provide the trial court with relevant information after conducting 24 therapy sessions with J.I.

Furthermore, the pretrial hearing provided Blanchette with the opportunity to fully cross-examine Bussart. Blanchette also called a psychologist to testify about the general nature of trauma under such circumstances. Blanchette failed to demonstrate a compelling reason to subject J.I. to further psychological examination. We conclude the trial court did not abuse its discretion in denying Blanchette's motion.

### Multiplicitous convictions

Blanchette claims his convictions of alternative counts of rape and aggravated indecent liberties with a child were multiplicitous. The State concedes this issue. Whether convictions are multiplicitous is a question of law subject to unlimited review. *State v. Groves*, 278 Kan. 302, 304, 95 P.3d 95 (2004).

The State charged Blanchette with one count of rape and, in the alternative, one count of aggravated indecent liberties with a child. The jury found Blanchette guilty on both counts. The trial court accepted the verdicts and adjudged Blanchette guilty of each offense. The trial court pronounced a sentence for both offenses, but the trial court "declined to impose" the sentence for aggravated indecent liberties with a child.

If a defendant is charged in a complaint or information with alternative counts, the jury is free to enter a verdict on each count. However, the defendant may be convicted of only one offense. *State v. Dixon*, 252 Kan. 39, 49, 843 P.2d 182 (1992); PIK Crim. 3d 68.09-A. Here, the trial court appeared to understand that it could not impose a sentence for each alternative count. Nevertheless, the trial court adjudged Blanchette guilty on both counts, and the journal entry of judgment reflects that Blanchette has been convicted of both crimes. As the State concedes, Blanchette's conviction of aggravated indecent liberties with a child must be reversed.

### Admission of photographs

Next, Blanchette claims the trial court erred by admitting gruesome and cumulative photographs into evidence. The trial court has broad discretion regarding the admission of demonstrative photographs. To determine whether such photographs should be admitted, the trial court must decide whether they are relevant and whether a proper foundation has been laid. *State v. Kirby*, 272 Kan. 1170, 1186, 39 P.3d 1 (2002).

At trial, Blanchette objected to five photographs of injuries to J.I.'s hymen. The photographs were taken with the use of a colposcope during J.I.'s sexual assault examination. Defense counsel argued that the nurse's explanation of J.I.'s injuries was sufficient

and the photographs did not assist the jury. The trial court overruled the objection and admitted the photographs into evidence.

Blanchette concedes that the photographs were relevant. However, he argues the photographs were far more prejudicial than probative and amounted to cumulative evidence admitted for the purpose of appealing to the passions of the jury. "While photographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence, demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue. [Citation omitted.]" *State v. Carr*, 265 Kan. 608, 623, 963 P.2d 421 (1998).

Here, the nurse testified as to the authenticity of each photograph and laid a proper foundation for their admission into evidence. The photographs were relevant to illustrate and corroborate testimony as to the nature and extent of the injuries. Injury to the hymen was particularly relevant because the jury was being asked to find the element of penetration to support the charge of rape rather than the alternative charge of aggravated indecent liberties with a child.

Further, the cause of the injuries was controverted. Blanchette asserted at trial that J.I.'s injuries must have occurred when he caught J.I. by her jeans as she started to fall from his arms. The State alleged that such an incident would only produce external injuries, not the type of internal injuries sustained by J.I.

The photographs admitted at Blanchette's trial were relevant and corroborated the medical testimony. They did not appeal to the passions of the jury, and the probative value of the evidence outweighed any prejudice. We conclude the trial court did not abuse its discretion in admitting the photographs into evidence.

*Prosecutorial misconduct*

Blanchette claims he was denied his right to a fair trial when the State made several inappropriate comments during its opening statement and closing arguments which amounted to prosecutorial misconduct.

An appellate court's review for an allegation of prosecutorial misconduct requires a two-step analysis. First, the appellate court decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, the appellate court decides whether those comments constitute plain error; that is, whether the statements prejudice the jury against the defendant and deny the defendant a fair trial, thereby requiring reversal. *State v. Elnicki*, 279 Kan. 47, 58, 105 P.3d 1222 (2005).

In the second step of the two-step analysis, the appellate court considers three factors to determine whether a new trial should be granted:

"(1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 [refusal to grant new trial is inconsistent with substantial justice] and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) [conclusion beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial] have been met." *State v. Tosh*, 278 Kan. 83, Syl. ¶ 2, 91 P.3d 1204 (2004).

Blanchette makes three specific claims of error. First, during the opening statement, the State noted that Blanchette told the police that J.I.'s injuries might have occurred when she started to fall from his arms and he caught her by the jeans. The State summarized:

"There is no bruises to the—where she was—fell or where jeans were pulled up too tight on the external part of her genitalia. Her labia is fine. Her labia majora is fine. It's not till you get inside her genitals, all the way to the hymen that we have injury. So the detective says that's—that doesn't wash, I mean, that's not an explanation that fits the facts of the case."

Blanchette asserts that "[b]y making these comments, the prosecutor not only managed to tell the jury what the officer thought about Mr. Blanchette's testimony but also managed to get his own personal opinion before the jury as well." This argument is without merit. Fair comment on the interpretation of evidence is appropriate when the State makes arguments to the jury. *State v. Mosley*, 25 Kan. App. 2d 519, 524-26, 965 P.2d 848, *rev. denied* 266 Kan.

1113 (1998). The State was simply relating the sequence of events and the evidence that would be presented to the jury. The information was relevant to explain why the detective did not accept Blanchette's explanation for the injuries.

The second claim of error is taken from the State's closing arguments. The State argued:

"One last thing to consider: When [J.I.] says, Richard touched my tee-tee, she tells it to the cop, she tells it to the nurse, she tells it to Diana Schunn, tells it to Detective Larkins. How could that child—how could Paula have known that when confronted with this, Mr. Blanchette would say, you know what, someone did touch her, matter of fact, I—I am sure someone touched her. Matter of fact, I told her mom about—that someone had touched her. He makes the quantum leap that someone had touched her, because she said, no, no, no, when he woke her up from the couch. From that, he is able to glean that someone touched her."

Blanchette takes issue with the State's decision to employ the phrase "quantum leap" when discussing the inference Blanchette drew from J.I.'s behavior. Blanchette equates this phrase with telling the jury that Blanchette was lying. We again conclude this argument is without merit. The State was not improperly commenting on Blanchette's credibility. The State's use of the word "quantum leap" did not amount to prosecutorial misconduct.

The final claim of error is also taken from the State's closing arguments. Blanchette argues the State misstated the law when it informed the jury that it could convict Blanchette of both alternative charges:

"The point is, if you—if you believe—all 12 of you believe that he placed his finger insider her labia and there was, by legal definition, penetration, then he's guilty of rape, he's not guilty of agg[ravated] indecent liberties. It's rape.

"If you're equivocal about that, if you're not sure about the penetration issue, then at the very least he's guilty of aggravated indecent liberties, because that requires simply that she be fondled or touched in a lewd manner, and that is defined for you in Instruction 11. That's why the two charges.

"Quite honestly, you could find him guilty of both, because in fondling her, the State's position is he also—his finger went inside to the hymen, so technically he's guilty of both. You could find him guilty of both, but make no mistake about it, my position is, the State's position is, he's guilty of rape."

When the statement is read in context, it is evident the State was attempting to communicate to the jury that enough evidence had

been presented to satisfy the elements of either crime charged. As previously discussed, it was appropriate for the jury to consider both counts against Blanchette. Even if the prosecutor's statement was somehow improper, the aggravated indecent liberties with a child conviction is being reversed, so any harm resulting from the misstatement of law is cured.

The statements at issue in this case were not outside the wide latitude that a prosecutor is allowed in discussing the evidence. Accordingly, Blanchette's claim that he was denied a fair trial due to prosecutorial misconduct is without merit.

### Cumulative error

Finally, Blanchette argues that cumulative errors in this case deprived him of his right to a fair trial.

Cumulative errors, when considered collectively, may be so great as to require reversal of any convictions. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied his or her right to a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence against the defendant is overwhelming. *State v. Plaskett*, 271 Kan. 995, 1022, 27 P.3d 890 (2001).

We find there was no cumulative error sufficient to deny Blanchette a fair trial. See *State v. Deiterman*, 271 Kan. 975, 992, 29 P.3d 411 (2001) (if no error is found in the defendant's case, the defendant's claim of cumulative error must likewise fail).

Affirmed in part, reversed in part, and remanded with directions to correct the journal entry to set aside the aggravated indecent liberties with a child conviction.