692 S.E.2d 299

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**WILLIAM M., Defendant Below, Appellant.**

No. 35130.

Supreme Court of Appeals of West Virginia.

Submitted March 3, 2010.

Decided March 11, 2010.

Scott A. Windom, Esq., Paul V. Morrison, II, Esq., Harrisville, WV, for Appellant.

Timothy L. Sweeney, Esq., Prosecuting Attorney of Pleasants County, West Virginia, St. Marys, WV, for Appellee.

KETCHUM, J.:

Appellant William M.[1] (hereinafter "Defendant") appeals the November 18, 2008, final order from the Circuit Court of Pleasants County convicting and sentencing him on four counts of sexual abuse by a parent, guardian or custodian, pursuant to *W.Va. Code* § 61–8D–5, and two counts of sexual abuse in the third degree, pursuant to *W.Va. Code* § 61–8B–5(a)(2). The defendant was sentenced to not less than thirty (30) nor more than sixty (60) years in the penitentiary.[2]

Following the defendant's conviction, defense counsel obtained 98 colposcopic images taken during the victim's sexual assault evaluation. The defendant contends that these 98 images are new and material evidence and argues that the circuit court erred when it denied his motion for a new trial based on this newly discovered evidence.

After considering the record, the briefs, and the oral arguments of the parties, we hold that the circuit court abused its discretion when it denied the defendant's motion for a new trial based on newly discovered evidence, and we reverse and remand this case for a new trial on all charges.

## I.

## Factual and Procedural Background

The charges against the defendant stem from allegations made by his twelve-year-old daughter Amber M. in 2006. The defendant and Amber M.'s mother, LeeAnn B., lived with their four children in a trailer in Pleasants County, West Virginia. The couple separated in June of 2006, and LeeAnn B. moved out of the family trailer, taking the four children with her. Following the separation, the defendant did not see his children for approximately six weeks, until the afternoon of July 21, 2006, when LeeAnn B. dropped the four children off at the defendant's trailer for a weekend visit. On July 23, 2006, the four children returned to their mother, LeeAnn B., who was living with a friend in Ohio. On July 24, 2006, Amber M. watched an episode of "The Maury Povich" television show that discussed child abuse. After watching the show, Amber M. told her mother that the defendant sexually assaulted her the previous weekend. Upon hearing this information, LeeAnn B. immediately took Amber M. to Marietta Memorial Hospital in Marietta, Ohio. The staff at Marietta Memorial was not trained in pediatric sexual assault evaluations so Amber M. was transported to another hospital, Southeastern Ohio Regional Medical Center located in Cambridge, Ohio.

Upon arriving at the second hospital, Amber was evaluated and interviewed by Pam Lucas, who specialized in sexual assault evaluations and was classified as a Sexual Assault Nurse Examiner (referred to as a "SANE nurse"). In her statement to Nurse Lucas, Amber stated that her father had been abusing her since she was nine years old. Concerning the specific allegations from

1. The use of the defendant's last name would make his young daughter easily identifiable. We will therefore adhere to our usual practice and refer to the parties by their first names and last initials only. *See In re Clifford K.,* 217 W.Va. 625, 619 S.E.2d 138 (2005).

2. The defendant was sentenced to not less than ten (10) nor more than twenty (20) years imprisonment on the four counts of sexual abuse by a parent, guardian or custodian, and sentenced to not less than one nor more than five years imprisonment on the two counts of sexual abuse in the third degree. The first three counts of sexual abuse by a parent, guardian or custodian were ordered to be served consecutively, the remaining three counts were ordered to be served concurrently to the first three counts, and thereby the defendant was effectively sentenced to not less than thirty (30) nor more than sixty (60) years in the penitentiary.

the weekend visit, Amber stated that her father asked her to get in bed with him at approximately 6:00 a.m. on Saturday morning, July 22, 2006, and "he touched me and put something in me, then he licked me down there." Amber later told Corporal Mike Bauso, of the West Virginia State Police, that on Friday evening, July 21, 2006, at 11:55 p.m., her father arrived home from work intoxicated, started fondling her breasts and inserted a finger into her vagina while they were on the couch in the trailer.

The defense called multiple witnesses at trial who testified that the defendant could not have committed the 11:55 p.m. assault on Friday evening because he did not arrive home from work until approximately 12:30 a.m. Saturday morning. Additionally, the defense called two of Amber M.'s friends who spent the night at the trailer with her on July 21, 2006. Both of these friends testified that Amber M. slept on the living floor room next to them. These two witnesses testified that they did not see Amber M. get up during the night and go into the defendant's bedroom, and both testified that Amber M. was asleep on the floor next to them when they woke up the following morning.[3]

After being evaluated by Nurse Lucas, another sexual assault evaluation was performed by Dr. Michelle Dayton. Dr. Dayton examined Amber using a colposcope, a medical instrument that magnifies the genitals and can be used to take pictures during a genital exam. Dr. Dayton took 98 colposcopic images during her evaluation of Amber. After conducting this evaluation, Dr. Dayton concluded that Amber had a scar and an abrasion on her vagina. The scar was consistent with the history of abuse Amber provided, while the abrasion was physical evidence that supported the alleged sexual assaults that occurred the previous weekend.

Following these evaluations, the hospital contacted a child services case worker in Ohio and advised LeeAnn B. to proceed to the West Virginia State Police in St. Marys, West Virginia. After an investigation, a grand jury returned a six-count indictment against the defendant, charging him with four counts of sexual abuse by a parent, guardian or custodian, pursuant to *W.Va. Code* § 61–8D–5, and two counts of sexual abuse in the third degree, pursuant to *W.Va. Code* § 61–8B–5(a)(2).

The trial in this matter began on July 18, 2007 and the State's first witness was Dr. Michelle Dayton. Dr. Dayton described the standard sexual assault evaluation the hospital performs when a child presents with allegations of sexual abuse. This procedure includes a general head-to-toe examination looking for injuries and taking the patient's sexual assault history. Dr. Dayton stated that after this initial examination is done, a colposcope is used to examine and record digital images of the victim's genitalia. Dr. Dayton described the use of the colposcope as follows:

This is looking at the female genitalia with something called a colposcope. A colposcope is like a microscope on wheels. It does not blow things up a hundred times. The magnification is 12 and 15 and 30, and that is big enough because you are looking at very small areas. Some of the children we see in the emergency department who have been sexually abused, they are very young, two or three years of age. That is a very small area on a little baby. So we are able to capture those images and look through excellent optics so that everything is clear, an area that is just two or three millimeters, if there is a tear, it is still a tear. It is still evidence of injury, but with 40 year old eyes you may not be able to see it clearly. If you magnify it, you can. That is what the colposcope is used for. When we use a colposcope, it also digitally records the images, so if I am not present in the room for every single exam, I am able to review the case. In this particular case I was working.

The 98 colposcopic images recorded by Dr. Dayton were not brought to court. Instead, the prosecution displayed a textbook photograph depicting the female anatomy on an overhead projector and had Dr. Dayton use a

---

3. This testimony will be discussed in greater detail in Section III, *infra.* To minimize redundancy, we provide only a brief summary of the evidence in Section I.

red marker to illustrate the location of the scar and abrasion that she found in the course of examining Amber M.

The existence of the 98 colposcopic images were revealed for the first time during the State's direct examination of Dr. Dayton. During cross-examination, the following exchange took place between counsel for the defendant and Dr. Dayton:

Q. Were digital images retained in this case?

A. Yes.

Q. And were those images made available to Mr. Sweeney (the prosecutor) or did you let him know about their existence?

A. I am not sure if it was reflected in the record. It is routine, they are not brought to court routinely or provided for any attorney because basically it looks like pornography to the layman because it is girl parts. It is naked girl parts. So it reflects—. It is no different than what is seen on the diagrams that are provided. The difference is it is in color. That is all.

Following this exchange, counsel for the defendant requested a sidebar and stated "Your honor, we requested photographs in our discovery requests.[4] These photographs were apparently quite detailed. We could have had our own expert examine those if we had known she had those in her possession." The prosecutor responded that he was not in possession of the colposcopic images and was unaware of their existence prior to Dr. Dayton's testimony. The court denied defense counsel's objection, finding that the colposcopic images were not photographs, but rather were digital images, and finding that the State did not have a duty to provide them to the defense because the colposcopic images were not in the State's possession. In so ruling, the court explained:

It is digital images, not photographs. It is images recorded like radiologists use on CD roms through their computer system that they use, same thing as they do x-

rays any more, not just an ordinary hard copy like a photograph. So it mischaracterizes it to say it's a photograph....

The rules of criminal discovery provide that the State is required to provide to the defense upon proper request only those matters they have in their possession. In reviewing the medical records here there is no indication that at any time the State was aware there was any type of digital recording generated through this examination. Therefore, it was not known to the State. If it was not known to the State or in its possession, it's not required to be disclosed. Your request is denied. (Emphasis added.)

Following this ruling, the trial continued for two days and concluded on July 20, 2007, with the jury convicting the defendant on all six counts. After the trial, the defendant obtained the 98 colposcopic images from Southeastern Ohio Regional Medical Center, filed a motion for a new trial based on this newly discovered evidence and retained a medical expert to analyze the colposcopic images.

On November 8, 2007, the circuit court conducted an evidentiary hearing on the defendant's motion for a new trial based on newly discovered evidence. At this hearing, the defendant called Dr. Stephen R. Guertin, Medical Director at Sparrow Regional Children's Center in Lansing, Michigan. Dr. Guertin testified that he performs about 20 examinations a month on children in abuse and neglect settings, and that 95 percent of these examinations involve sexual abuse. Dr. Guertin testified that he uses a colposcope in almost every one of these exams and that photographs taken by the colposcope are part of the medical record and are available "for review by outside reviewers and for court."

Dr. Guertin was asked about Dr. Dayton's findings of an abrasion and a scar. Dr. Guertin testified that he reviewed the colpo-

---

**4.** On October 16, 2006, counsel for the defendant filed an omnibus "Motion for Discovery," which included the following:

    **4. Documents and Tangible Objects:**

      The defendant requests that the State provide to defense counsel, prior to trial, a *written*

*list* of all .... photographs .... which are within the possession, custody and control of the State.... Also, the defendant asks that the State provide defense counsel with copies of any and/or all photographs. W.Va.Code § 62–1B–2; R. Cr.P., Rule 16(a)(1)(c).

scopic images taken during Amber M.'s evaluation and found that to a reasonable degree of medical certainty there was not an abrasion. When asked whether he found a scar, Dr. Guertin testified that when a doctor sees a white patch in that area of the female anatomy it is commonly mistaken for a scar but it can be a normal structure called the linea alba. One can not tell if it is a scar according to Dr. Guertin.[5]

On September 24, 2008, the circuit court denied the defendant's motion for a new trial based on newly discovered evidence. The circuit court found:

> [T]hat the jury's verdict was proper in light of all of the evidence presented at trial; that the availability of the images from the digital images, when reproduced, as taken by the Colposcope, would have not resulted in a different verdict; that it was not new evidence, but it was available to the Defendant prior to the verdict upon exercise of due diligence and the evidence was not new or material because the State had sufficient evidence from Dr. Dayton's direct testimony and the demonstrative aid and the sole purpose of the new evidence based upon Dr. Guertin's testimony would be [sic] discredit or impeach the State's expert, Dr. Dayton.

After the circuit court denied his post-trial motion, the defendant filed this appeal.

## II.

### Standard of Review

■ This Court has indicated that as a general proposition, it will review a circuit court's ruling on a motion for a new trial under an abuse of discretion standard. *See In re State Public Building Asbestos Litigation,* 193 W.Va. 119, 454 S.E.2d 413 (1994). Additionally, in *State v. Helmick,* 201 W.Va.

163, 495 S.E.2d 262 (1997), this Court indicated that for a convicted defendant to prevail on a motion for a new trial based on newly discovered evidence, the defendant has the burden of proving five elements. Those elements are set forth in Syllabus Point 1 of *State v. Frazier,* 162 W.Va. 935, 253 S.E.2d 534 (1979), which states:

> A new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from the facts stated in his affidavit that plaintiff was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and not merely cumulative, and cumulative evidence is additional evidence of the same kind to the same point. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side.

## III.

### Discussion

#### A. Digital Images

■ Before addressing the circuit court's denial of the defendant's motion for a new trial based on newly discovered evidence, we note that the circuit judge questioned whether colposcopic images are "photographs" under our rules of evidence. The circuit judge stated that the colposcope recorded "digital

---

5. Dr. Guertin's testimony regarding whether the colposcopic images reveal a scar is as follows:
   This is an area that is actually well in front of the hymen, part of what we call the posterior fourchete where two halves of the private structure come together in the back toward the anus and there is a natural junction line there that often times will result in a white patch, a junction patch. We call it a linea vestibularis or linea alba. And when you see those in

midline it is commonly mistaken for a scar but it can be a normal structure. It could be a part of this thing called a linea alba. It's called linea alba because it's white and that is what alba means. And when you see something like that right in midline, (a) it could be a scar, (b) it could be a normal structure called linea alba or (c) it could even be from an accidental type injury. So you don't know which of those three it is.

images, not photographs. It is images recorded like radiologists use on CD roms through their computer system that they use, same thing as they do x-rays any more, not just an ordinary hard copy like a photograph."

Upon our review of the 98 colposcopic images, it is clear that they are photographs under Rule 1001(2) of the *West Virginia Rules of Evidence,* which states " 'Photographs' include still photographs, X-ray films, video tapes, and motion pictures." While the colposcopic images may be stored digitally, there is no requirement under our rule that an image must be stored on photographic film or paper to be considered a photograph. In Justice Cleckley's *Handbook on Evidence,* he notes that a "liberal interpretation ... should be given to photographs, including x-rays, films, and videotapes." 1 Cleckley, *Handbook on Evidence,* Vol. II § 10.2(B), 10–8 (2000).

Courts outside of our jurisdiction have concluded that colposcopic images are admissible. *See State v. Noltie,* 57 Wash.App. 21, 786 P.2d 332 (1990) (colposcopic slides showing the condition of a victim's sexual organs and expert testimony based upon the colposcopic slides were admissible). *See also State v. Blanchette,* 35 Kan.App.2d 686, 704–05, 134 P.3d 19, 32 (2006) (colposcopic images were relevant and properly admitted into evidence because they corroborated the medical testimony).

■ In order to resolve any question on this issue, we hold that digital images are "photographs" under Rule 1001(2) of the *West Virginia Rules of Evidence.*[6]

### B. Newly Discovered Evidence

■ The defendant claims that the circuit court erred when it denied his motion for a new trial based on the newly discovered colposcopic images. The first factor we consider under *Frazier, supra,* is whether the evidence has been discovered since the trial. The 98 colposcopic images were revealed for the first time during Dr. Dayton's trial testimony. Prior to her testimony, neither the State, nor the defendant were aware that the images existed. After the trial was over, the defendant obtained the 98 colposcopic images and had a medical expert review them. The defendant was not aware of these images until Dr. Dayton's trial testimony, and he was unable to obtain them and have them analyzed by an expert until after the trial concluded. We therefore find that he has satisfied the first *Frazier* factor.

The second factor states that the defendant must show that he was diligent in ascertaining and securing his evidence and that the new evidence is such that due diligence would not have secured it before the verdict. The State's reply to the defendant's discovery requests[7] included the following, "the State has furnished on the 7th day of September, 2006, *all medical records from the victim's examination,* copies of which are also attached hereto." (Emphasis added.) The State also assured the defendant that it was "unaware of any exculpatory or impeachment material in this matter." The defendant relied on these responses from the State, and the medical records themselves, which provided no indication that colposcopic images had been recorded.

The State asserts that the defendant was given authorization to obtain Amber M.'s medical records and that he could have discovered the colposcopic images through due diligence. The defendant sought this authorization to obtain gynecological records unrelated to the evaluation conducted by the SANE nurse and Dr. Dayton. The defendant, relying on the State's assertion that it had provided "all medical records from the victim's (sexual assault) examination" had no reason to seek additional records from Southeastern Ohio Medical Center. It is disingenuous for the State to argue that the defendant could have discovered the colposcopic images through due diligence, when the prosecutor was also unaware that these

---

6. A digital photograph may be authenticated in the same manner as a film photograph, by a witness with personal knowledge of the scene depicted who can testify that the photograph

fairly and accurately represents it. *See Rule 901 of the West Virginia Rules of Evidence.*

7. *See* Footnote 4, *supra.*

images existed prior to Dr. Dayton's trial testimony.

After the trial, defense counsel sent Southeastern Ohio Regional Medical Center a request asking for all "medical records regarding Ms. M.'s care and treatment, including copies of *photographs and/or digital images obtained by the use of a colposcope.*" (Emphasis added.) Despite this specific request, the hospital's response did not include the 98 colposcopic images. After failing to receive the colposcopic images, defense counsel contacted the Director of Emergency Services at Southeastern Ohio Medical Center, Pam Hivner, who, after repeated requests, provided defense counsel with the 98 images. Ms. Hivner stated that the colposcopic images were not initially produced because the hospital does not ordinarily disclose colposcopic images since they are potentially embarrassing for the patient. Dr. Dayton's trial testimony reflected the hospital's non-disclosure policy when she stated colposcopic images are "not brought to court routinely or provided for any attorney because basically it looks like pornography."

We conclude that there was nothing in the record that should have alerted the defendant that colposcopic images were recorded during Amber M.'s evaluation. The defendant had the right to rely upon the State's discovery response which stated that *"all medical records from the victim's examination"* had been disclosed. (Emphasis added.) The defendant has satisfied the second factor under *Frazier.*

The third factor states that newly discovered evidence must be new and material, and not merely cumulative, and cumulative evidence is additional evidence of the same kind to the same point. This Court addressed cumulative evidence in Syllabus Point 2 of *State v. O'Donnell,* 189 W.Va. 628, 433 S.E.2d 566 (1993), stating:

> To be cumulative, newly discovered evidence must not only tend to prove facts which were in evidence at trial, but must be of the same kind of evidence as that produced at the trial to prove those facts. If it is of a different kind, though upon the same issue, or of the same kind on a

different issue, the new evidence is not cumulative.

The 98 colposcopic images are evidence "of a different kind ... upon the same issue." One of the main issues during the trial was whether the results of the sexual assault evaluation corroborated Amber M.'s allegations of sexual abuse. Dr. Dayton testified that her physical findings supported Amber M.'s sexual assault allegations. The prosecution displayed a textbook photograph of the female anatomy on an overhead projector and had Dr. Dayton highlight the areas where she found an abrasion and a scar. The 98 colposcopic images show the exact condition of Amber M.'s genitalia at the time she underwent the sexual assault evaluation. This evidence is clearly of a different kind than that presented at trial, and the defendant has satisfied the third factor under *Frazier.*

We consider the fourth and fifth *Frazier* factors simultaneously. The fourth factor states that the newly discovered evidence "must be such as ought to produce an opposite result at a second trial on the merits." The fifth factor states that a new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side. To determine whether the 98 colposcopic images "ought to produce an opposite result" at a new trial and whether the sole object of the images would be to impeach a prosecution witness, we consider the evidence produced at the first trial.

During the first trial the defendant called multiple witnesses who cast serious doubt on Amber M.'s description of the events that occurred on the evening of July 21, 2006, and the early morning of July 22, 2006. Amber M. stated that the defendant abused her twice during that time period. The first occurrence was at 11:55 p.m. on July 21, 2006, after the defendant arrived home from work and allegedly fondled her breasts and inserted a finger into her vagina while they were on a couch in the trailer. The defendant worked as a dish washer at a restaurant that was located approximately 30 minutes from his trailer. The owner of the restaurant, Marilyn Pettit, testified that the defen-

dant clocked out at 11:44 p.m. on July 21, 2006. The defendant rode to and from work on July 21, 2006, with a fellow employee, Joe Peyton. Mr. Peyton testified that it normally took a half-hour to drive from the restaurant to the defendant's trailer. Mr. Peyton testified that it was not possible for the defendant to clock out at 11:44 p.m. and arrive back at his trailer by 11:55 p.m. A neighbor and friend of the defendant's, Amy Bogard, babysat the defendant's children while he was at work. She testified that the defendant arrived home from work at approximately 12:30 a.m. She testified that she stayed at the trailer talking with the defendant until approximately 1:30 a.m. that morning. Ms. Bogard testified that when she left the trailer, all of the children were asleep in the living room. Along with the defendant's four children, Amber M. had two friends who spent the night with her on July 21, 2006. One of her friends, Lacie D., testified that she slept on the living room floor with Amber M. and their other friend, Amber F. Amber F. testified that she slept on the living room floor with Amber M. and Lacie D. None of the witnesses who were at the trailer that evening testified that the defendant arrived home from work by 11:55 p.m., and none of these witnesses saw the defendant with Amber M. on the couch.

The second occurrence of abuse that Amber M. reported occurred at approximately 6:00 a.m. on Saturday morning, according to the statement she gave to the SANE nurse.[8] Amber M. stated that she woke up and used the bathroom and the defendant suggested that she get into his bed. Lacie D. testified that she woke up around 6:00 or 7:00 a.m. that morning and that Amber F. and Amber M. were still asleep on the living room floor at that time. On cross-examination, Lacie D. admitted that she did not see a clock upon waking up, but testified that it was just starting to be daylight outside. Lacie D. testified that she went back to sleep on the living room floor after waking up and that she woke up for good a few hours later. Lacie D. stated that she was the first one to wake up for good, followed by Amber F., and

then Amber M. Lacie D. testified that Amber M. was wearing street clothes (jeans) both when she fell asleep and when she woke up. Amber F. also testified that she went to sleep on the living room floor with Lacie D. and Amber M., and woke up the next morning next to Lacie D. and Amber M. Amber F. testified that she did not see Amber M. in the defendant's bed at any time.

While the defense was able to raise serious doubt as to Amber M.'s version of events, the testimony of Dr. Dayton stood unrebutted at trial and was the crucial piece of the prosecution's case. Dr. Dayton testified that her examination of Amber M.'s genitalia revealed an abrasion and a scar that were consistent with the history of abuse Amber described. During the State's closing argument, the prosecutor continually highlighted the fact that the defense did not present a medical expert to rebut Dr. Dayton's findings. The prosecutor told the jury, "He (defense counsel) wants you to disregard evidence that is uncontradicted, that again, there is no evidence, there is no expert to the contrary." The prosecutor acknowledged that "Amber got some things wrong when she was relating it, but the inconsistencies, I would submit to you are minor." The prosecutor argued that these inconsistencies should be considered minor because, "You don't have to just believe her because we have physical evidence uncontradicted."

In view of the State's heavy reliance on the uncontradicted medical testimony in this case, the disclosure of the 98 colposcopic images could produce an opposite result at a second trial and would have value as both exculpatory and impeachment evidence for the defendant. According to the defendant's post-trial medical expert, Dr. Guertin, the colposcopic images did not reveal an abrasion and he cast serious doubt on whether the images revealed a scar. This is exculpatory evidence because it would have buttressed the defendant's contention that he did not sexually abuse Amber M. A jury hearing testimony from Dr. Guertin could determine that he is more qualified and more credible

8. At trial, Amber M. stated that she could not remember what time she got into the defendant's bed.

than the State's medical expert. There is a distinct difference between the defense cross-examining Dr. Dayton and speculating about potential causes for the unrebutted finding that Amber M. had a scar and an abrasion, rather than being able to present direct medical evidence that there was no scar or abrasion. Without the colposcopic images, the defense was unable to present this exculpatory evidence.

We find the colposcopic images, along with Dr. Guertin's expert medical opinion, is sufficient to satisfy the fourth factor under *Frazier*. We also conclude that the value of the colposcopic images is not limited to impeachment evidence and find that the fifth *Frazier* factor has been satisfied.

Since we have determined that the defendant is entitled to a new trial based on newly discovered evidence, we decline to address the remainder of the defendant's assignments of error.[9]

## IV.

### Conclusion

The circuit court's November 18, 2008, order convicting and sentencing the defendant is reversed and this case is remanded for a new trial on all charges.

Reversed and Remanded.

Justice BENJAMIN concurs and reserves the right to file a separate opinion.

---

9. The defendant argues that the State's non-disclosure of the colposcopic images violated his constitutional due process rights under *State v. Youngblood*, 221 W.Va. 20, 650 S.E.2d 119 (2007). The defendant also asserts that the circuit court erred by (1) refusing to allow him to present evidence at a 404(b) hearing regarding his alleged prior acts of sexual abuse; and (2) admitting double hearsay statements made by the victim to a nurse during a sexual assault examination. The defendant argues that the cumulative effect of these alleged errors denied him a fair trial.